UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

SCBA LIQUIDATION, INC.,
f/k/a SECOND CHANCE BODY ARMOR, INC.,

Debtor.

Case No: GT 04-12515
Chapter 7

_____/

## OPINION GRANTING TRUSTEE'S MOTION TO APPROVE SETTLEMENT OF ADVERSARY PROCEEDING

Appearances:

Ronald A. Schuknecht, Esq., Smith Haughey Rice & Roegge, P.C., Traverse City, Michigan, James J. Parks, Esq., Mark G. Cooper, Esq., Benjamin J. McCracken, Esq., and Heather M. Maldegen-Long, Esq., Jaffe, Raitt, Heuer & Weiss, P.C., Southfield, Michigan, attorneys for James W. Boyd, Chapter 7 Trustee.

Donald A. Snide, Esq., Varnum, Riddering, Schmidt & Howlett, LLP, Grand Rapids, Michigan, Konrad L. Cailteux, Esq., Debra A. Dandeneau, Esq., David R. Singh, Esq., and Christopher D. Barraza, Esq., Weil, Gotshal & Manges LLP, New York, New York, Michael J. Lyle, Esq. and Eric C. Lyttle, Esq., Weil, Gotshal & Manges LLP, Washington, D.C., attorneys for Toyobo Co. Ltd., Toyobo America, Inc., Masakazu Saito, Tadao Kuroki, and Yoshinari Ohira.

Kay Standridge Kress, Esq., Pepper Hamilton LLP, Detroit, Michigan, attorney for ASM Capital L.P. and ASM Capital, II, L.P.

Karin F. Avery, Esq., Silverman & Morris, P.L.L.C., West Bloomfield, Michigan, attorney for Steven W. Lemmings, et al.

## I. INTRODUCTION.

On February 22, 2011, James W. Boyd, Trustee for Second Chance Body Armor, Inc. (the "Trustee") filed a Motion for Order Approving Settlement of Adversary Proceeding (the "Motion to Approve Settlement" or the "Motion"). The Motion seeks court approval of a settlement agreement in an adversary proceeding brought by the Trustee against Toyobo Co., Ltd., Toyobo America, Inc., Tadao Kuroki, Yoshinari Ohira, and Masakazu Saito

(collectively "Toyobo" or the "Toyobo Defendants"). The proposed settlement agreement contemplates a comprehensive mutual release of all claims in the adversary proceeding in exchange for a $5 million cash payment to the estate by the Toyobo Defendants and the withdrawal of Toyobo's proofs of claim in the bankruptcy case. The payment by Toyobo will occur if, and when, the settlement becomes final and the attendant order is nonappealable.

If the settlement is approved, Toyobo will no longer be a party in interest in the bankruptcy case, the adversary proceeding will be dismissed, and years of contentious litigation will finally be concluded. ASM Capital, L.P. and ASM Capital, II, L.P. (collectively "ASM"), holders of general unsecured claims totaling approximately $5.3 million, filed a timely objection to the Trustee's Motion (the "Limited Objection"). For the reasons that follow, this court finds that the proposed settlement represents a fair and equitable resolution of the adversary proceeding. Accordingly, ASM's objection to the settlement shall be overruled and the Trustee's Motion to Approve Settlement shall be granted.

## II. ISSUE.

The sole issue presented is whether the proposed settlement agreement in the adversary proceeding between the Trustee and the Toyobo Defendants is fair and equitable and should be approved by the court.

## III. JURISDICTION.

The court has subject matter jurisdiction over this bankruptcy case and the adversary proceeding. 28 U.S.C. § 1334. The case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D. Mich.). The

2

Trustee's Motion to Approve Settlement is a core proceeding.  28 U.S.C. § 157(b)(2)(A) and (O).  The majority of the Trustee's claims in the adversary proceeding are also core proceedings.  Id.  To the extent some of the Trustee's claims are not core proceedings, the parties have consented to this court entering a final judgment.  See 28 U.S.C. § 157(c)(2); Trustee's Third Amended Complaint, AP Dkt. No. 286, at ¶ 24; Toyobo's Answer to Third Amended Complaint, AP Dkt. No. 288,  at ¶ 22-24.

This opinion constitutes the court's findings of fact and conclusions of law regarding the Trustee's Motion to Approve Settlement.  FED. R. BANKR. P. 7052.  The statements in this opinion regarding the facts alleged at trial and the legal causes of action are for context only and do *not* represent the court's findings of fact or conclusions of law in the underlying adversary proceeding.

## IV.  PROCEDURAL HISTORY.

The litigation between the Trustee and the Toyobo Defendants has a long and complicated procedural history.  On March 3, 2004, the National Association of Police Organizations, Inc., Thomas Callahan, and the Fort Myers, Florida Police Department (the "State Court Plaintiffs") filed a breach of warranty action against Second Chance Body Armor, Inc. ("Second Chance") and Toyobo in the Circuit Court for the County of Antrim, Michigan. The lawsuit alleged that bullet-resistant vests manufactured by Second Chance, which contained Zylon fiber produced by Toyobo, did not provide the necessary level of ballistic protection for the duration of Second Chance's five-year warranty period.  On April 27, 2004, Second Chance filed a cross-complaint against Toyobo, alleging that the vest durability issues were caused by defects in the Zylon produced by Toyobo and its unexpected degradation under certain conditions.

3

Second Chance filed a voluntary chapter 11 petition on October 17, 2004. Shortly thereafter, Toyobo removed the state court lawsuit to the United States District Court for the Western District of Michigan. On January 10, 2005, the district court referred the lawsuit to this bankruptcy court as Adversary Proceeding 05-80019. After the case was removed, Second Chance and Toyobo resolved the dispute with the State Court Plaintiffs. On November 22, 2005, Second Chance's bankruptcy case was converted to chapter 7. James W. Boyd was appointed as the chapter 7 trustee.

In the time that the adversary proceeding has been pending before this court, the pleadings have been amended several times.[1] The Trustee ultimately filed his Third Amended Complaint on December 12, 2008.[2] The Third Amended Complaint states fourteen causes of action against the Toyobo Defendants, including counts for breach of express warranties, breach of implied warranties, breach of contract, and fraud.[3] The Toyobo Defendants filed their Answer, Affirmative Defenses and Counterclaims to the Third Amended Complaint on January 16, 2009.[4] Toyobo's answer raises fifteen

---

[1] See Trustee's First Amended Complaint, AP Dkt. No. 42, Toyobo Co., Ltd. and Toyobo America's Answers to First Amended Complaint and Counterclaim, AP Dkt. Nos. 45 & 46, Individual Defendants' Answer to First Amended Complaint, AP Dkt. No. 219, Trustee's Second Amended Complaint, AP Dkt. No. 266, Toyobo's Answer to Second Amended Complaint and Counterclaim, AP Dkt. No. 272.

[2] AP Dkt. No. 286.

[3] The specific claims are: breach of implied warranties (Counts I and II), breach of express warranties (Count III), fraud and misrepresentation (Counts IV through IX), breach of contract (Counts X and XIV), promissory estoppel (Count XI), unjust enrichment (Count XII), and indemnity (Count XIII).

[4] AP Dkt. No. 288.

affirmative defenses and asserts three counterclaims.[5]

The court has also entered several pretrial orders and written opinions during the pendency of this adversary proceeding. These orders have included: an order appointing an international process server;[6] orders relating to motions to dismiss the adversary proceeding;[7] an opinion and orders relating to motions for summary judgment;[8] and orders relating to motions in limine or to exclude testimony from proposed witnesses.[9]

The adversary proceeding has been further complicated by other aspects of the bankruptcy case and related litigation. The unsecured claims universe in Second Chance's chapter 7 case includes sizeable claims filed by the United States of America (the "U.S. Claim") and Steven W. Lemmings, et al. on behalf of a certain group of class claimants (the "Class Claim"). The U.S. Claim totals $217,900,808.58[10] and relates to a qui tam action currently pending against Second Chance and other parties, including Toyobo, in the United States District Court for the District of Columbia. The Trustee has tried to

---

[5] The counterclaims asserted by Toyobo are: (1) that Second Chance fraudulently induced Toyobo to enter into a rebate agreement; (2) that Toyobo is entitled to common law indemnification from Second Chance; and (3) that Second Chance is liable to Toyobo for unjust enrichment.

[6] AP Dkt. No. 120.

[7] AP Dkt. Nos. 188, 215.

[8] AP Dkt. Nos. 445, 446, 447, 448, 449; In re Second Chance Body Armor, Inc., 417 B.R. 750 (Bankr. W.D. Mich. 2009) (Opinion Denying Motions for Summary Judgment).

[9] AP Dkt. Nos. 482, 483, 484, 485, 486, 491, 503, 504, 505, 509.

[10] As originally filed, the U.S. Claim totaled $281,386,192.46. The claim was amended on May 5, 2011.

resolve the U.S. Claim on two separate occasions.[11] Each time, the Toyobo Defendants have objected.[12] And each time, the Trustee's efforts to resolve the claim have been unsuccessful.[13] The Class Claim totals $181,134,000 and relates to claims brought by purchasers of Second Chance's vests in various class action lawsuits. The Trustee objected to the Class Claim in July, 2009.[14] Again, the Toyobo Defendants opposed the calculations underlying the Trustee's objection to the Class Claim.[15] The court ultimately overruled the Trustee's objection.[16]

## V. FACTUAL BACKGROUND OF ADVERSARY PROCEEDING.

Trial of the adversary proceeding began on November 9, 2009. By the time the settlement agreement was reached in February, 2011, sixty-five days of trial had been conducted. In assessing whether to approve the settlement agreement, it is appropriate for the court to consider and briefly summarize the exhibits and testimony presented during the sixty-five days of trial.[17]

---

[11] See Trustee's Motion for Settlement of Claims of United States of America and Settlement of Qui Tam Action Entited United States ex rel Westrick v. Second Chance Body Armor, Inc. et al. Pursuant to Rule 9019, Dkt. No. 1267, and Trustee's Objection to Claim #932 of the United States of America, Dkt. No. 1996.

[12] Dkt. Nos. 1291, 2000.

[13] See Order Granting Motion to Withdraw Trustee's Motion for Settlement, Dkt. No. 1624, and Order Denying Trustee's Objection to Claim #932, Dkt. No. 2046.

[14] Dkt. No. 1997.

[15] Dkt. No. 1999.

[16] See Order Denying Objection to Class Claim #666, Dkt. No. 2045.

[17] In many instances, a bankruptcy court is called upon to approve or deny a proposed settlement before a trial or evidentiary hearing begins. This settlement is somewhat unique because the court has heard much testimony and has read many

A. _Witnesses and Credibility._[18]

At trial thus far, the court has heard testimony from twenty-five witnesses. Those witnesses included four former members of Second Chance's Executive Committee: Thomas (Ed) Bachner, Richard Davis, James Larry McCraney, and Paul Banducci. The three named individual defendants from Toyobo, Masakazu Saito, Tadao Kuroki, and Yoshinari Ohira, and three additional Toyobo employees, Yoshihiko Teramoto, Yukihiro Abe, and Yasuo Ohta, also appeared and testified with the assistance of a Japanese translator. Thirteen other Toyobo representatives testified through video deposition.[19] Finally, the court heard testimony from two of the Trustee's expert witnesses.[20]

The court found the witnesses from Second Chance to be generally credible. Some critical aspects of their testimony, however, seemed self-serving, contradictory, and conclusory. The testimony regarding Second Chance's use of and reliance on accelerated aging data provided by Toyobo is one example. Ed Bachner, Second Chance's Vice President of Technology and Product Assurance and the individual responsible for the company's design and development of soft body armor, testified that he was skeptical about the correlation between the aging data reported by Toyobo and the actual

---

exhibits that have been admitted into evidence. The court believes it must consider what it has heard to date rather than attempting to engage in self-inflicted amnesia.

[18] When referring to the "daily transcripts," the court utilizes "Tr. at __;" in referring to admitted exhibits, the court utilizes "PX" for the Trustee's exhibits and "DX" for Toyobo's exhibits.

[19] These witnesses were Takaharu Ichiryu, Hiroki Murase, Hiroshi Hirahata, Fumio Hotogi, Shigekazu Itakura, Kohei Kiriyama, Kota Kitamura, Toshiyuki Matsui, Hironori Eguchi, Yukinari Okuyama, Yukihiro Nomura, Toru Matsumoto, and Toru Kitagawa.

[20] The expert witnesses were Donald E. McLemore and Carter K. Lord.

performance of vests in the field. This skepticism is also reflected in various documents admitted into evidence. However, other exhibits showed that Second Chance was both interested and concerned about the data being reported by Toyobo. When asked if it would have been important or helpful for Second Chance's decision-making process if Toyobo had disclosed its accelerated aging data showing the strength retention of Zylon fiber taken out of woven fabric sooner, Bachner replied, "The answer *has* to be yes."[21] (Tr. at 3388, 3/16/2010.) Paul Banducci, former Vice President of Global Sales and Marketing and general manager of Second Chance, also testified that Toyobo's accelerated aging data was important to Second Chance when making decisions about continued use of Zylon in its vests. (Tr. at 9401, 1/14/2011.) Banducci did not elaborate, however, on how the data specifically impacted Second Chance's decision-making process.[22]

Other testimony by Second Chance representatives now appears too vague to establish important elements of the Trustee's causes of action. For instance, Richard Davis, Second Chance's founder and former President, testified that after Zylon's durability issues were discovered, representatives of Toyobo repeatedly told him that the strength degradation was "leveling off." (Tr. at 2572-74, 2615-18, 3/1/2010.) Davis was unable to

---

[21] Bachner's choice of words appears equivocal rather than a solid statement indicating reliance.

[22] Banducci was principally involved in sales and marketing, rather than manufacturing the vests. He relied on other persons inside or outside of Second Chance for technical information. Although he stated that Second Chance relied upon Toyobo, the reliance was mostly during the 1996-1998 development period. Also, Banducci lacked some seemingly critical information such as the "Answers to [Toyobo] President Ukai's Questions" dated September 25, 2001. (PX 3792.) However, it should be noted that Toyobo characterized such information as merely internal discussions or, in the court's words, similar to "brainstorming." These internal discussions sometimes drastically conflicted with Toyobo's official statements made to Second Chance.

identify these Toyobo employees by name or recall exactly when these alleged representations were made. (Id.) Davis also remembered asking a Toyobo representative about Zylon's durability in 1998 or 1999, when Second Chance was initially deciding whether Zylon should be used in its ballistic vests, and being reassured that Zylon would not "wear out" and would wear better than other fibers, like Kevlar or Twaron. Again, Davis could not recall when, where, or by whom this alleged representation was made. (Tr. at 2976-84, 3/2/2010.) He was likewise unable to identify *any* document in which these representations were made.

The credibility of the Toyobo witnesses varied significantly and was often problematic. Some of the Toyobo employees were extremely credible. Others were less than forthcoming and left the court with the impression that they were stonewalling and hiding information. These other witnesses were frequently non-responsive to questions posed by the Trustee's attorneys (and sometimes the court). At times, it took four or five attempts to get a response to a particular question. In other instances, a witness's incomplete or vague answer was belied by statements in the exhibits themselves. Three of Toyobo's witnesses – Fumio Hotogi, Yukihiro Nomura, and Toru Kitagawa – were particularly outrageous in the evasiveness of their testimony. At one point, Nomura, the holder of various bullet resistant vest patents which were admitted into evidence, testified that he did not know what a bullet was. This caused the court to raise concerns that Nomura may have crossed the boundary line between extreme evasiveness and perjury.[23]

---

[23] The court decided not to take any action during trial because it might delay the proceedings and result in an unnecessary "legal sideshow."

### B. Exhibits.

The evidence presented at trial thus far has included more than 700 exhibits which were admitted into evidence. Some of these exhibits were voluminous; many were originally written in Japanese and required English translations.[24] During the trial, the court authored three written opinions regarding admissibility of evidence[25] and made hundreds of oral rulings on evidentiary objections.

### C. General Summary of Facts Established at Trial.

Second Chance was a leading producer of soft, concealable body armor for law enforcement officers and military personnel. The company was founded by Richard Davis in 1970, after he was shot while delivering pizza in Detroit. Throughout its history, Second Chance constantly sought new ways to manufacture thinner, lighter, and ultimately more wearable body armor for its customers. (Tr. at 1867, 1/28/2010.) Some of the advances made by Second Chance were the result of improvements in the raw materials used to make the vests. For example, in 1973, DuPont commercialized a new aramid[26] fiber called Kevlar 29/49. This new "super fiber" enabled Second Chance to manufacture vests with

---

[24] Translation issues were further complicated on several occasions when the parties offered competing translations of various exhibits, with differing shades of meaning.

[25] In re Second Chance Body Armor, Inc., 421 B.R. 823 (Bankr. W.D. Mich. 2010) (Memorandum Opinion Denying the Toyobo Defendants' (1) Motion in Limine to Exclude National Institute of Justice Reports; (2) Motion to Bar Evidence of ZKP Development . . . and (3) Motion to Require the Trustee to Use Certified Translations to Prove the Content of Japanese-Language Documents); In re Second Chance Body Armor, Inc., 423 B.R. 303 (Bankr. W.D. Mich. 2010) (Memorandum Opinion Granting Trustee's Motion for Clarification of Evidentiary Ruling Related to Red Yarn); In re Second Chance Body Armor, Inc., 434 B.R. 502 (Bankr. W.D. Mich. 2010) (Memorandum Opinion Rescinding Evidentiary Ruling Provisionally Admitting Plaintiff's Trial Exhibit 667).

[26] Aramid fibers are also known as aromatic poly-amids or p-aramids. Both Kevlar and Twaron are types of aramid fibers. (Tr. at 152-53, 1/21/2010.)

significantly better ballistic capabilities than its original vests, which were made from ballistic nylon. (PX 599; DX 733.) Other advances were the result of improvements in vest design and construction methods. For instance, by the mid-1990s, Second Chance was producing "fourth generation" MONARCH vests, using two types of aramid fiber, Kevlar 129 and Twaron T-2000. (PX 599.) The MONARCH vests also incorporated a new weaving technology developed by Second Chance, new stitching techniques, and breathable water-proof ballistic pad covers. As a result of these changes, Second Chance's MONARCH vests were significantly lighter, thinner, and more comfortable than previous models.

In 1996, Ed Bachner, Second Chance's soft body armor designer, learned of a new super fiber, made from the rigid-rod polymer poly-p-phenylenebenzobisoxazole ("PBO"), which was being developed by Toyobo. (DX 847.) The information Bachner received described PBO fiber as having impressive physical properties, including superior tensile strength,[27] that peaked Bachner's interest in using the new fiber in ballistic applications. These same qualities led Richard Davis to refer to PBO fiber as "Kevlar on steriods." (Tr. at 1940-41, 1/28/10.) In May of 1996, Bachner contacted Toyobo to inquire about the possibility of evaluating PBO fiber for use in Second Chance's soft body armor. (PX 480.) Tadao Kuroki, a Toyobo employee who worked on applications development and sales of PBO fiber, responded to Bachner's letter, stating that Toyobo agreed that PBO was promising for use in ballistic applications. (PX 444.) Kuroki also sent Bachner a Zylon Technical Brochure detailing the properties of PBO fiber. (PX 757.) The technical

---

[27] According to the National Institute of Justice ("NIJ"), the U.S. government agency responsible for testing and certifying ballistic resistant vests, tensile strength "is the maximum stress (force exerted over a given cross-sectional area) that a body (in this case, a fiber) can withstand prior to failure." (PX 3860.)

11

brochure stated that PBO's tensile strength and modulus[28] were superior to p-aramids. (Id.) The brochure explained that the fiber was soft and flexible despite its high mechanical properties, and therefore, could be used for "comfortable protective garments," such as ballistic vests. (Id.) The technical brochure also included a disclaimer, which read: "Before designing any product by using the materials contained herein, please study and examine carefully whether they fit your intended applications, purposes, conditions of process, etc. All data cited herein are not warranty figures, but [are] for reference purposes only." (Id.) Both Bachner and Larry McCraney, Second Chance's Vice President of Manufacturing and Operations, testified that this disclaimer was not unusual and that fiber manufacturers routinely attempted to disclaim warranties on their products. (Tr. at 3139-43, 3/15/2010; Tr. at 4358-59, 4/30/2010.)

This was the beginning of a long – and initially very successful – collaboration between Second Chance and Toyobo relating to the development of bullet-resistant vests made from PBO fiber. The parties' efforts included determining the optimum weave for production of PBO fabric and sharing of ballistic testing results. In written communications between Second Chance and Toyobo during this time period, representatives of both companies refer to these joint development efforts as a "partnership."[29] (See, e.g., PX 1251, 2361.)

During this time, Second Chance and Toyobo signed a confidentiality agreement relating to the disclosure of information about experimental PBO fibers. (PX 935.) The

---

[28] The NIJ explains that modulus is "a technical term that describes the stiffness of a material." (PX 982.)

[29] The parties have stipulated and reminded the court on more than one occasion that this "partnership" is not a legal relationship between Second Chance and Toyobo.

confidentiality agreement prohibited Second Chance from performing any chemical analysis of the experimental PBO fibers. In the agreement, Toyobo also disclaimed "any express or implied warranties" with respect to the experimental fibers, including any warranty that the fibers were "useful for any purpose." (Id.) In 1997, the initial term of the confidentiality agreement was extended through September 30, 1998. (DX 136.)

In 1998, Toyobo provided Second Chance with updated Technical Information regarding PBO fiber. (PX 119, 406, 1442.) The 1998 Technical Information described PBO fiber as the "next generation super fiber whose strength and modulus are almost double those of p-Aramid fiber." (Id.) In support of this statement, Toyobo cited data showing that PBO's properties were superior to Kevlar and other aramids in nearly all respects. The Technical Information disclosed, however, that PBO fiber "loses strength in high humidity temperature steam condition" and retained only 40-50% of its initial tensile strength after 50 hours of exposure to temperatures of 180°C and steam. (Id.) The fiber's strength was reduced to less than 20% after 50 hours of exposure to temperatures of 250°C and steam. Although this strength loss seems dramatic, PBO fiber's ability to retain strength at these very high temperatures was still superior to the strength retention of p-aramids under the same conditions. The document includes the same disclaimer as the 1996 Technical Brochure.

On October 1, 1998, Toyobo began commercial production of PBO fiber, under the name Zylon. In its letter announcing the commercialization of Zylon, Toyobo advised its customers that "Toyobo is responsible for the qualities of ZYLON or ZYLON material which Toyobo provides but can not be responsible for the products made of or from ZYLON or ZYLON material which Toyobo provides." (PX 468, 610; DX 1170.)

Soon after commercialization, Second Chance began using Zylon in its production of Ultima vests. From the beginning, these lighter, more comfortable vests were very popular and sold "like gangbusters." (Tr. at 207, 1/21/2010.) In a letter to Toyobo dated February 15, 1999, Bachner described sales of the Ultima vests as "not just taking off," but "BLASTING OFF." (PX 424.) Paul Banducci, Second Chance's general manager and Vice President of Sales and Marketing, also informed Toyobo that the "initial market reaction" to the Ultima vests was "very strong" and stated that the "product is generating tremendous excitement." (PX 612.) The first Ultima vest "save"[30] was recorded in September of 1999. Upon hearing of the save, Masakazu Saito, the sales and marketing manager of Toyobo's Zylon department at the time,[31] stated he was "delighted" and that he was "proud of the quality of the fiber and proud of having such an excellent partner" in Second Chance. (PX 174.)

The evidence submitted at trial so far does not include any written contracts for the sale of Zylon directly from Toyobo to Second Chance. Instead, the current proofs show that Zylon was provided to Second Chance through a multi-step process. As explained by Kuroki, Toyobo received orders to ship Zylon to specific weavers designated by Second Chance. After this, Zylon fiber produced by Toyobo in Japan was sold to the weavers through a Japanese trading house, ITOCHU, and its American subsidiary. The weavers manufactured Zylon fabric in accordance with Second Chances's specifications and the

---

[30] A "save" is when the vest is, or appears to be, responsible for preventing loss of life or life-threatening injury. (Tr. at 1866, 1/28/2010.) Second Chance was proud of its "saves," kept track of them, and used the information to market its vests. (See, e.g., PX 455, 503.)

[31] In 2002, Saito became the general manager of Toyobo's Zylon Department.

14

Zylon fabric was then sold by the weavers to Second Chance.[32] (Tr. at 9711-14, 1/11/11.)

Throughout commercial production of Zylon, shipments of fiber to weavers were accompanied by Toyobo Certificates of Analysis or Specification Sheets. By signing these specification sheets, Toyobo certified that the Zylon it sold had a minimum tensile strength of 35 cN/dtex at the time of shipment.[33] Toyobo also certified that the fiber met minimum specifications regarding modulus, elongation at break,[34] and denier[35] at the time of shipment. Early on, these certificates of analysis contained no warranty disclaimers. (See, e.g., PX 1382, 1636, 1637, 3772.) As of January 2001, Toyobo added language stating: "Toyobo makes no warranty and assumes no liability whatsoever in connection with any use of this material. Users determine for themselves the suitability for their intended use of the material." (PX 1639.) Importantly, the evidence submitted by the Trustee thus far has not established that Toyobo made any misrepresentations about Zylon's initial physical properties in these specification sheets.

Early in 2001, Toyobo began receiving complaints from rope manufacturers regarding significant, unexplained strength loss in Zylon rope. These complaints prompted Toyobo to begin "accelerated age" testing on Zylon, to help determine its ability to retain

---

[32] The exception to this Zylon product supply chain were the rebate agreements directly between Toyobo and Second Chance. Those rebate agreements are discussed in greater detail below.

[33] In the examples admitted into evidence at trial, the actual tensile strength was typically around 37 cN/dtex. (See, e.g., PX 1382, 1636, 1637, 3772.)

[34] Elongation is the stretch a material undergoes when it is subjected to a pulling force. Elongation at break is the amount of elongation a material has undergone when it reaches its breaking point. (Tr. at 1006, 1/14/2010.)

[35] Denier generally refers to the thickness of the fiber. (Tr. at 8170, 11/8/2010.)

15

strength at high temperatures and humidity. Initially, Toyobo tested Zylon at 60°C and 80°C and 80% relative humidity. Soon thereafter, Toyobo also began testing Zylon at 40°C and 80% relative humidity, which was "thought to be the upper limit for practical use."[36] (DX 1064.)

According to internal Toyobo documents, this early testing revealed that Zylon lost tensile strength over time, even at normal temperatures and humidity. More importantly, Zylon's strength declined "markedly" in high temperatures and humidity, while Kevlar's strength loss in these same conditions was relatively low. (PX 3021, 3786; DX 1064.) Toyobo's employees testified consistently that they were surprised by the results of this testing. (See, e.g., Tr. at 4693-95, 5/13/2010; Tr. at 5024-26, 6/2/2010; ) Because Toyobo's prior testing at much higher temperatures (180°C and 250°C) and humidity had revealed that Zylon retained more of its strength in these conditions than Kevlar, Toyobo did not expect such a difference at lower temperatures. The documents also show that Toyobo suspected hydrolysis[37] as one possible cause of the strength deterioration. (PX 3021, 3786; DX 1064.)

Despite these concerns about Zylon's strength retention under certain conditions, sales of Zylon for use in Second Chance's vests continued. In May and June of 2001, Second Chance and Toyobo also finalized and signed a rebate agreement. (PX 1646; DX

---

[36] The court notes that the 40°C/80% relative humidity testing might approximate natural weather conditions found in places such as southern Florida.

[37] The NIJ defines hydrolysis as "the decomposition of a chemical compound by reaction with water." (PX 982.) According to the Trustee's expert in materials and polymer science, Dr. McLemore, hydrolysis causes a reduction in the molecular weight of the fiber, which leads to a reduction in tensile strength, and finally to a reduction in the fiber's toughness and ability to absorb energy. (Tr. at 488-89, 11/19/2009.)

284.) Under the rebate agreement, when Second Chance bought Zylon fabric from one of the weavers listed in the agreement, Toyobo would make a rebate payment to Second Chance based on the amount of Zylon consumed. (Tr. at 7080; 9/20/2010.)

Also during this time period, Second Chance was pursuing vest contracts with several German governmental entities. The requirements of the these contracts were somewhat unique. The Bavarian government, for example, demanded a ten-year warranty on the ballistic vests and was planning to monitor vest performance throughout that period. (Tr. at 61-62, 1/22/2010.) This warranty requirement was significantly greater than the five-year warranty Second Chance typically provided on its vests, which was the industry standard in the United States. Second Chance[38] and a German company, Mehler, were originally awarded the Bavarian contract jointly. However, after Mehler insisted on additional ballistic testing, which its vests failed, Second Chance was awarded the entire Bavarian contract.[39]

On July 5, 2001, as the Bavarian contract was being negotiated, Dutch State Mines ("DSM") issued a press release stating that it had conducted tests which showed "serious indications that the use of PBO-fiber in bullet resistant vests may not be justified."[40] (PX

---

[38] According to the testimony of Paul Banducci, the contract was actually awarded to Second Chance's German subsidiary, Second Chance GMBH. (Tr. at 9024, 12/21/2010.)

[39] Around this time, Second Chance was considering an IPO that might make its shareholders rich. Although there was not much evidence about this, the court believes this possibility may have colored Second Chance's decision-making on such things as the continued use of Zylon and doubling its typical five-year warranty to a ten-year warranty to procure the Germans' business.

[40] When the court reflected on the Second Chance negotiations ("tender") regarding the German contracts and the time line regarding other occurrences, including Zylon information and the possible IPO, one word came to mind – "greedy."

800, admitted for limited purposes.)  This announcement caused great concern in the ballistics industry.  That same day, in response to DSM's announcement, Toyobo issued its own letter to customers, including Second Chance.  Graphs depicting the results of Toyobo's accelerated age testing at 60°C, 80% relative humidity and 80°C, 80% relative humidity were attached to the letter.  Summarizing the results of these tests, Toyobo acknowledged that Zylon's tensile strength "decreases under high temperature and humidity conditions" and that this decrease is likely due to hydrolysis.  Toyobo also stated that, based on its preliminary testing, it "expect[ed] almost no strength loss at about 40 degree C even at 80% humidity."  (PX 887, 1281, 1282, 3776; DX 315, 1168.)

On July 12, 2001, Second Chance and Toyobo met to discuss the DSM announcement.  At the meeting, representatives from Second Chance, particularly Bachner, expressed doubts about the value of accelerated age data for predicting the actual performance of ballistic vests.  (DX 1108.)  To better understand how vests were performing in actual use, Second Chance undertook its first phase of used vest testing in July 2001.  This testing involved gathering used vests from various geographic regions, observing the age and condition of the vests, and evaluating their ballistic performance through V50 testing.[41]  Second Chance also requested assistance from Toyobo in analyzing the strength of fibers from the used vests and understanding the causes of the performance shifts that were observed in the used vest testing.  (PX 614, 615, 1258.)  Toyobo agreed to provide such assistance.  (PX 419; DX 376.)

---

[41] The NIJ defines this type of ballistic limit testing as a way to estimate "the velocity at which a given bullet is expected to completely penetrate a body armor panel 50 percent of the time." (PX 1094.)

Toyobo also continued to issue reports containing updated accelerated age data reports on Zylon fiber throughout the summer and fall of 2001. (PX 109, 727, 1287; DX 1105.) These reports generally showed Zylon losing strength at a slow, steady rate in conditions of heat and humidity. In a letter accompanying the data released by Toyobo on July 25, 2001, Saito informed Second Chance that Toyobo predicted that Zylon would experience a 10% strength loss after 10 years of exposure to conditions of 40°C and 80% relative humidity. (PX 109, 727; DX 1105.) The letter asked Second Chance to consider this information when designing its products. (Id.)

Toyobo also instituted its Zylon strength reduction improvement project ("ZKP project") in July 2001. Through this project, Toyobo sought to understand and correct the two main shortcomings that had become apparent with Zylon: first, its strength loss at normal temperatures and humidity, and second, its relatively rapid short-term strength loss in conditions of heat and humidity. (PX 2589, 2896, 3803; DX 1036.) The ultimate goal of the ZKP project was to manufacture Zylon with strength retention properties which were equal to or better than Kevlar. To achieve this goal, Toyobo conducted numerous tests as part of the ZKP project. This included tests to measure the strength of fibers taken out of woven Zylon fabric, after the fabric was exposed to conditions of 40°C and 80% relative humidity. The initial existence of the ZKP program and its testing results were not disclosed to Toyobo's customers.

On November 26, 2001, Toyobo issued updated accelerated age data which caused renewed concerns over Zylon's strength loss. (PX 725, 1288, 876, 3834, DX 1105.) Unlike prior updates which showed Zylon losing strength at a constant rate, the last three data points on the November 26 update sloped sharply downward, indicating that Zylon's

19

strength at 40°C and 80% relative humidity dropped significantly after 100 days. Bachner described this update as the "nose dive data" and explained that the new picture painted by the data – i.e., that Zylon's degradation might accelerate, rather than level off, over time – caused great concern to Second Chance and within the ballistics industry. (Tr. at 87-90; 1/22/2010.)

On December 13, 2001, Second Chance and Toyobo met in Los Angeles to discuss the "nose dive" data. At this "crisis management" meeting, Second Chance informed Toyobo that it had determined to take various corrective measures, including a re-design its Ultima vests, to compensate for the fact that Zylon's strength loss appeared greater than previously expected. (PX 751, 3838.) Second Chance also requested financial assistance from Toyobo to help cover the costs of the vest re-design and other corrective actions. (Id.) Bachner's handwritten notes from the meeting indicate Toyobo's reaction to this request for financial assistance was "strong" and "negative." (Id.)

After the Los Angeles meeting, Second Chance and Toyobo continued discussions about the November 26 data and Toyobo's possible financial support of Second Chance's responses thereto. In a letter to Richard Davis dated December 20, 2001, Tetsunosuke Nojima, the general manager of Toyobo's Zylon Operations Department, again refused Second Chance's requests for financial assistance. (PX 875.) Nojima's letter stated however, that Toyobo "promise[d] to give the latest fiber information to every customer continuously and positively."[42] (Id.) That same day, Toyobo sent Second Chance a

---

[42] During the trial proceedings, the court characterized this as the "Nojima promise." This promise was made directly by Toyobo to Second Chance, as contrasted to the Zylon product supply chain.

20

proposal for a new "volume discount program." (PX 177, 1407, 3840.)

Almost immediately after Nojima's promise, a committee within Toyobo convened to discuss how and when information about Zylon's properties should be disclosed to customers and the general public.[43] The minutes from the committee meeting held on December 27, 2001, reflect that, under the new disclosure policy, information provided to customers would be based on known facts (not predictions) and "internal consensus." According to Saito, it was decided, under this new policy, that the three problematic data points in the November 26 release should be deleted because they represented results from a single sample and did not "statistically correctly represent[] Zylon." (Tr. at 6457, 8/3/2010). The committee also decided that the "details and frequency with which information [was] to be disclosed to specific clients (in particular, [Second Chance])" would be "determined separately with sufficient consideration given to prevailing circumstances."[44] (DX 1110.) Finally, the committee determined that "[n]o external disclosure of data relating to change over time of processed products (i.e., fiber from fabric) [would] be made." (Id.)

On December 28, 2001, Toyobo informed Second Chance that it was rescinding the November 26 update and removing the last three data points from the report. (PX 630.) Toyobo issued updated accelerated age data omitting the problematic data points on January 1, 2002.[45] The cover letter from Nojima explains that the data was removed after

---

[43] Thus far, there are no exhibits admitted regarding how or why the committee was constituted or any preliminary pre-meeting communications regarding the matters to be discussed by Toyobo's designated scientists and sales personnel. In other instances, such writings exist and were admitted as exhibits.

[44] How "prevailing circumstances" would be assessed by Toyobo was unstated.

[45] The measurements from the three samples were averaged back in to the accelerated age data issued by Toyobo in April 2002. (PX 1291, DX 1105.)

21

intensive and careful review revealed that it was "statistically not correct and not reliable" and expresses Toyobo's "regret" for having caused "confusion in the marketplace." (PX 1290, 2670, 3835; DX 1105.)

Much of Second Chance's concern about Zylon's strength retention was alleviated by Toyobo's rescission of the November 26 data, although internal discussions about the potential problems continued at Second Chance. Communications between Second Chance and Toyobo also continued in early 2002. For example, at a meeting on February 1, 2002, Toyobo explained the reasoning behind its removal of the three data points from the November 26 data to Second Chance. Toyobo also informed Second Chance that the degradation caused by hydrolysis would likely become slower over time and, at the very least, would not accelerate. Finally, Toyobo informed Second Chance that it was working to develop a new Zylon with the same initial strength, but improved durability. (PX 487, 877.) After much internal debate, and despite Bachner's concerns over used vest test results which raised questions about the performance of its vests, Second Chance eventually decided the re-design of its Ultima vests was not necessary. (PX 868, 869; DX 556.) Second Chance and Toyobo finally entered into their new rebate/promotional agreement in April 2002. (PX 1395.)

Toyobo's internal efforts to understand the causes of Zylon's strength loss and to identify solutions to the problem continued throughout 2002. By April 2002, Toyobo had ruled out some potential options for resolving Zylon's hydrolysis issues, but was still considering at least two others. The first involved treating the fibers with a phenylenediamine ("PDA") dye to prevent moisture from penetrating the fiber. The second option was the addition of phthalocyanine blue ("blue pigment") during the polymerization

22

process. (PX 3819; DX 1085.) Both of these options eventually proved unworkable. By October 2002, the PDA dye was ruled out due to concerns about its toxicity and the inability to perfect its use in the manufacturing process. (DX 1090; Tr. at 6944-47, 8/30/2010.) Use of the blue pigment was not commercially feasible because it clogged the nozzles on the production machines, causing the filters to require replacement every five days. (DX 1088, Tr. at 6957-59, 8/30/2010.)

During this time, growing concerns about Zylon's strength loss and frustrations over the inability to solve the problem were also being expressed by individuals within Toyobo. Several posts on Toyobo's on-line discussion board reflect a tension between the Zylon sales department, which wanted a quick, inexpensive solution to the Zylon strength issue, and the Zylon scientists and researchers, who were struggling to understand the hydrolysis problem and required more time to evaluate possible countermeasures. (PX 2953, 2959, 3790.) In a July 4, 2002 post, Saito also expressed his uneasiness about Zylon's "half-baked performance" and stated that he got "chills down [his] spine" when he looked at the internal data about Zylon's strength retention. (PX 2958.) Later that same day, Saito posted: "Time marches on. In current Zylon hygrothermal data, [strength] continues to fall at a higher than expected speed. Time has passed, of course for Sales, but also for the hopes of customers too."[46] (PX 2960.)

The accelerated age data released by Toyobo during 2002 continued to show Zylon steadily losing strength at 40°C and 80% relative humidity, and questions about Zylon's suitability for use in ballistic vests persisted. Second Chance began its second phase of

---

[46] During this time, Zylon's public personae was portrayed far differently than Toyobo's internal assessments.

used vest testing late in 2002.[47]

In the summer of 2003, as Second Chance's Phase II vest testing progressed, concerns, approaching distress, about Zylon's strength loss intensified when two police officers were shot.  Both officers were wearing Zylon vests; one was killed and one was severely injured.   During this same time, the results of the Phase II testing became available to Second Chance.  The test results showed that Second Chance's Zylon vests were wearing out sooner than expected and might present a safety issue for the individuals wearing them.  Thereafter, on September 11, 2003, Second Chance announced a recall and remedial program for its Ultima and Ultimax vests.  (PX 161, 523.)

After announcing its recall, Second Chance met with Toyobo on October 8, 2003. At this meeting, Toyobo disclosed results from accelerated age testing it had conducted on Zylon fibers that were taken out of woven fabric.  It also shared the results of ballistic testing it had done on woven Zylon fabric test pads.  The results of these tests, which were disclosed to Second Chance for the first time at this meeting, showed that the strength retention of fibers taken out of fabric was much worse than the strength retention of the fibers themselves.  Although it was generally known in the ballistics industry that fibers could experience some loss of tensile strength during the weaving process, Bachner reported being "stunned" and "angry" at the fiber from fabric test results.[48]  (PX 489; Tr. at

---

[47] Bachner continued to believe that shooting used vests was a much better indicator of performance than Toyobo's accelerated age testing.

[48] The court also took notice of Toyobo's belated disclosure of "fiber from fabric" tests.  Would not the results of such tests be more valuable and similar to field use than the "fiber from bobbin" accelerated age testing?  Would not Second Chance sit up and take greater notice (and more likely rely upon) the "fiber from fabric" testing?  Given the facts in the record at this time, the court can only speculate.

24

196, 1/22/2010.)

Toyobo disclosed this additional accelerated aging and ballistic data in writing to Second Chance and its other customers in a letter dated October 10, 2003. (PX 123, 1085, 3830.) Thereafter, the Zylon finger pointing[49] intensified as Toyobo and Second Chance each issued a series of press releases. Toyobo claimed that the durability problem was unique to Second Chance's vests and must be related to their design; Second Chance argued that the performance issues with its vests were caused by faulty Zylon. (See, e.g., PX 484, 616, 1416, 3075, 3645.)

The National Institute of Justice also weighed in on the Zylon controversy. On November 18, 2003, the NIJ announced it was commencing an investigation into ballistic vests containing Zylon. (PX 1089.) The NIJ's investigation included two phases of used vest testing. The results of this testing were reported in three "Status Reports," question and answer supplements to the status reports, and several "Advisory Notices" regarding the safety of Zylon for use in ballistic vests.[50] (PX 982, 1093, 1094, 3860; DX 961, 964.) In one such advisory notice, issued in August 2005, the NIJ advised users of Zylon vests that it had identified PBO or Zylon "as a material that appears to create a risk of death or serious injury as a result of degraded ballistic performance when used in body armor." (PX 1104.) The NIJ also amended its vest certification standards as a result of its Zylon investigation. (PX 3862 (2005 Interim Standard).) Although Zylon vests were arguably eligible for certification under the new requirements, the vests could only be certified if the

_____

[49] Bachner characterized this as the "blame game." (Tr. at 204, 212, 1/22/2010; Tr. at 1704, 1/28/2010.)

[50] Toyobo, as expected, fought admission of the various NIJ reports. The court disagreed with Toyobo's arguments.

25

manufacturer provided evidence that the armor would "maintain the intended level of ballistic performance throughout the warranty period."[51] (DX 961.)

After the recall of its 100% Zylon vests, Second Chance continued to use Zylon in combination with other materials in some of its other vest models. (DX 942, 1134.) In April 2004, Second Chance stopped selling these other models as well. (Tr. at 9285, 1/3/2011.) As negative perceptions about Zylon vests continued to grow, and lawsuits against it mounted, Second Chance ultimately filed its chapter 11 petition on October 17, 2004. Given the pending and prospective litigation, it could not survive.

## VI.  TRUSTEE'S MOTION TO APPROVE SETTLEMENT.

### A.  Terms of Trustee's Settlement Agreement with Toyobo.

On February 15, 2011, after sixty-five days of trial, the Trustee reached a settlement agreement with the Toyobo Defendants (the "Settlement Agreement").  The Trustee subsequently filed his Motion to Approve Settlement on February 22, 2011.  The Motion was served upon the entities designated as "Service Parties" in the proposed Settlement Agreement.[52]

As stated in the Trustee's Motion, the Settlement Agreement provides that, in exchange for mutual releases of all claims in the adversary proceeding, the Toyobo Defendants will pay the bankruptcy estate $5 million in cash.  The Toyobo Defendants will also withdraw all of their claims against the estate.  Because the exact universe of

---

[51] To date, based upon brief testimony, the court believes that no manufacturer has been able to meet the NIJ burden of durability using 100% Zylon fibers in a vest.

[52] The court finds service of the Motion to be proper and sufficient.

unsecured claims has yet to be determined with certainty, the value of the Toyobo claims withdrawal also cannot be stated with certainty. According to the estimates in the Trustee's Motion, Toyobo's claims, if allowed in full, would represent seventeen to twenty-five percent (17-25%) of the unsecured claims universe. Therefore, withdrawal of Toyobo's claims would result in the estate not having to pay Toyobo between $4,590,000 and $6,750,000. When this reduction is considered, the Trustee estimates the total value of the Settlement Agreement to be between $9,590,000 and $11,750,000. After payment of litigation costs and attorney's fees, the Trustee believes the net value of the Settlement Agreement to creditors of the estate is between $1,496,530 and $2,930,000.

In addition, under the Settlement Agreement, the Toyobo Defendants agree that they will no longer be parties in interest in the bankruptcy case. Toyobo will lack standing to continue to oppose other settlements previously advanced by the Trustee. Finally, the Settlement Agreement provides that the adversary proceeding will be dismissed with prejudice.

On February 24, 2011, the court issued a Scheduling Order regarding Trustee's Motion to Approve Settlement of Adversary Proceeding. The order established procedures and a deadline by which creditors and parties in interest could file objections to the proposed settlement and scheduled a date for a hearing.

### B. ASM's Limited Objection to Approval of the Settlement Agreement.

On March 29, 2011, ASM filed its Limited Objection to the Trustee's Motion to Approve Settlement. The arguments raised by ASM in its Limited Objection do not directly relate to the four factors generally considered by bankruptcy courts when evaluating compromises proposed by estate representatives. For example, ASM does not specifically

assert that the amount of the settlement is unreasonably low given the probability of the Trustee's success in the litigation. ASM admits it has not reviewed the testimony and evidence submitted at trial and cannot opine as to whether the Trustee's evaluation of the probability of success in the litigation is accurate.

The concerns raised in ASM's objection to the proposed settlement fall into two general categories. First, ASM asserts that "[i]t is difficult, if not impossible, to assess the fairness of the proposed settlement" and its potential benefit to the estate at the present time because the Trustee is unable to state with specificity the amount of creditors' aggregate allowed claims and the proposed pro rata distribution to creditors. This is due, in part, to the fact that the amounts of the U.S. Claim, the Class Claim, the claims filed by various German governmental entities, and other vest claims have not yet been determined.[53] As a result, ASM states that the exact value of the Toyobo claims withdrawal cannot be calculated. ASM also maintains that the attorneys' fees and expenses incurred in the Toyobo litigation have not been appropriately considered in the Trustee's calculations. ASM argues that, until each creditor's "piece of the pie" is known with certainty, the impact of the proposed settlement on the creditors cannot be evaluated. According to ASM, this precludes court approval of the Settlement Agreement.

ASM's second argument relates to the timing of the proposed settlement. ASM characterizes the Trustee's Motion to Approve Settlement as an apparent concession that the Trustee will not prevail on the merits of the litigation at trial. Looking in the rearview mirror, ASM questions why the Trustee did not earlier recognize a low probability of

---

[53] In the base case, the Trustee has sought to settle some of those claims but has been opposed by Toyobo.

28

success prior to expending the resources (and incurring the delay) required to litigate the Trustee's claims through sixty-five days of trial. ASM further asserts that any difficulties in collecting a potential judgment or delays due to appeals were, or should have been, recognized and considered by the Trustee prior to pursuing the litigation. The upshot of ASM's position is that the Trustee should not have even instituted the adversary proceeding.[54]

### C. Evidentiary Hearing on Motion to Approve Settlement.

On April 4, 2011, the court held a status conference to discuss the issues raised in ASM's Limited Objection. An evidentiary hearing regarding the Trustee's Motion to Approve Settlement was held on May 6, 2011.

James W. Boyd, the chapter 7 trustee ("Boyd"), was the sole witness at the evidentiary hearing. Boyd has served as a panel trustee in the Western District of Michigan since 1988. In those twenty-three years, he estimates that he has handled between 23,000 and 25,000 chapter 7 cases. He has also served as a chapter 11 trustee in fifteen to twenty cases and has been appointed as a state court receiver several times. As a trustee and receiver, Boyd has been involved in numerous adversary proceedings and other litigation – litigation which is frequently resolved by settlement agreements. In addition to his work experience, Boyd is the Immediate Past President of the National Association of Bankruptcy Trustees, is a co-author contributor to the Michigan Institute of Continuing Legal Education publication on consumer and small business bankruptcies, and is a frequent speaker at American Bankruptcy Institute and Federal Bar Association

---

[54] It is unclear whether ASM believes the Trustee should have opposed Toyobo's claims against the estate or not.

seminars. Boyd has also served on the faculty for the National Bankruptcy Training Institute, a program of the Executive Office of the United States Trustee that provides training for chapter 7 trustees. Without any doubt, the court finds that Boyd is a highly-qualified, experienced, and well-respected chapter 7 trustee.

Without reservation, the court finds that Boyd testified credibly about his involvement in the adversary proceeding and the circumstances that led to the settlement. He explained that he was involved in prosecution of the adversary proceeding almost immediately upon his appointment after the case converted to chapter 7. In December 2005, he met with various creditors, including members of the Attorney Generals Working Group,[55] counsel for the class claimants, an attorney for the United States government, and counsel for the chapter 11 unsecured creditors' committee. All of these parties had been actively involved in the adversary proceeding during the chapter 11 case. According to Boyd, these parties "knew more about the substance of the adversary than most creditors do in your typical bankruptcy case, believed it was an important asset of the estate," and thought that the litigation "needed to be pursued." (Tr. at 21.)[56] Indeed, contrary to ASM's current position, Boyd explained that, if he had requested the court to dismiss the adversary proceeding prior to the start of discovery and abandoned the causes of action, he was "99 percent confident" that such request would have been met with

---

[55] This group was comprised of approximately twenty-two state attorneys general who were involved in lawsuits against Second Chance either through the individual states or through the class action.

[56] Citations in this subsection are to the official transcript from the May 6, 2011 evidentiary hearing. See Dkt. No. 2323.

"strenuous objections from multiple creditors."[57]  (Tr. at 26-27.)

During this time period, the Attorney Generals Working Group and the counsel for the class claimants raised concerns that the chapter 11 counsel for Second Chance was not "pushing the case hard enough," possibly due to their close relationship with the Debtor's insiders.  (Tr. at 22.)  As a result of the creditors' concerns, and in exercise of his independent judgment, Boyd determined to search for new counsel to represent the estate in the pending litigation against Toyobo.  Boyd received proposals from several law firms. Although these proposals varied, most of these firms "believed that there was a case to be pursued."  (Tr. at 26.)  Boyd ultimately selected Jaffe Raitt to represent the estate in the adversary proceeding.

Boyd continued to be "relatively hands on" with the adversary proceeding during the necessarily extensive discovery process.  (Tr. at 27.)  He explained that, although he did not review everything in complete detail, copies of exhibits and deposition testimony were provided to him throughout the discovery phase.  He also had conference calls to discuss the progress of the case with his attorneys at least every three weeks.

In addition to its long duration, the discovery phase of the case was also costly for the estate.  Boyd explained that, of the approximately $5 million in expenses incurred by the estate during the litigation, about $3.9 million were incurred during discovery.  (Tr. at 32-33.)  These expenses included costs for expert witnesses, document management, translations of Japanese documents, interpreters, and travel to Japan for many depositions.

---

[57] Based upon the court's impression, it believes a "firestorm" of objections would have occurred.

31

After the majority of discovery was completed, and prior to the commencement of trial, Boyd again assessed the strength of the estate's claims against Toyobo. This assessment was based on Boyd's personal review of the case and consultations with his counsel. In September or October 2009, Boyd also enlisted the assistance of two knowledgeable and highly respected retired bankruptcy judges, Judge William Brown and Judge William Bodoh, to assess the viability of the estate's causes of action in the adversary proceeding. (Tr. at 30-32.) Both Judge Brown and Judge Bodoh informed Boyd that they believed the estate's claims were colorable and should be pursued. (Tr. at 32.)

Trial commenced in November 2009, and Boyd attended all but one or two of the sixty-five trial days that were held. Boyd's general counsel also attended sixty-four days of the trial. Boyd explained that he believed it was important for him to be present at trial to consult with his litigation counsel. Perhaps even more significantly, he believed it was "critical" that he be present to assess how the proofs were progressing and to perceive how the court was reacting to the evidence. (Tr. at 37.)

Boyd described the progress of the trial as an "ebb and flow" of "good days and bad days." (Tr. at 37-38.) He explained that early in the trial, he was "generally quite comfortable" with the progress of the case. (Tr. at 38.) This general confidence was bolstered by a chambers settlement concept suggested by the court on July 20, 2010, after thirty-nine days of trial. Although the court did not attach any numbers to the concept it proposed, Boyd and his attorneys estimated that the settlement amount would be between $85 million and $95 million if the settlement concept were implemented.

Boyd's confidence in the strength of the estate's case against Toyobo began to

wane in the late fall of 2010.   Boyd explained that the court had stated repeatedly, throughout the case, that the estate, as plaintiff, had the burden to prove *all* elements of its various causes of action.[58]   By the fall of 2010, the Trustee had presented many of its fact witnesses.   Despite this fact, Boyd perceived that the court's comments about the difficulty of proving all of the elements of the causes of action were becoming more frequent.   With each such comment, Boyd's concerns about the estate's ability to  prove its case grew.

As a result of his growing sense that the weaknesses in the estate's case were beginning to outweigh the strengths, Boyd decided to enter into the Settlement Agreement with Toyobo.   He explained that all three components of the Settlement Agreement – the $5 million cash payment, the withdrawal of Toyobo's claims, and the fact that Toyobo would no longer be a party in interest in the bankruptcy case – were essential terms of the agreement from the estate's perspective.   Boyd testified that he would not have agreed to the settlement if any one of these components had been absent.

With regard to the value of the settlement, Boyd stated his belief that the $5 million

---

[58] At the hearing, ASM pointed out that the court had commented on the difficulties faced by the Trustee in proving his case in an early evidentiary opinion entered in January 2010.  See In re Second Chance Body Armor, Inc., 421 B.R. 823, 840 n.11 (Bankr. W.D. Mich. 2010) ("The court has previously commented, both during pretrial proceedings and during trial, that the Trustee will have difficulty in establishing sufficient cogent evidence to prove any theory of liability raised in the Trustee's amended complaint.").  To the extent ASM suggests this comment should have been a red flag to the Trustee that he would not be successful in the litigation, the court rejects that assertion.

As Boyd explained in his testimony, the "fact that the court was expecting us to prove up our case" was a "given." (Tr. at 96.)  The court frequently commented about the Trustee's burden of proving and linking up the elements of its causes of action.  Boyd's concerns in late 2010 did not stem from new found knowledge that the court expected the estate to prove its causes of action, but rather from the growing realization that its case was drawing to a close and some potential gaps in the proofs still existed.

cash payment was "fundamentally better for the creditors of this estate than nothing," which is what the estate would receive if it failed to establish its causes of action in adversary proceeding. (Tr. at 45.) When he entered into the settlement, Boyd believed there was a "real possibility" that continuation of the trial might result in no recovery for the estate. (Tr. at 45.)

Boyd also elaborated on the estate's estimates regarding the value of Toyobo's agreement to withdraw its proofs of claim. Boyd estimated that the total value of Toyobo's proofs of claim was approximately $85,060,000. (Tr. at 57.) This amount represented a "worst case scenario" estimate, and assumed that Toyobo would be entitled to recover on its claims that it was fraudulently induced to enter into a 2002 rebate agreement with Second Chance, as well as its claims for indemnification and/or contribution relating to amounts Toyobo had paid, or would be required to pay, as a result of alleged defects in Second Chance's Zylon vests.[59] Boyd further explained that the total unsecured claims in the case were estimated to be approximately $332,500,000.[60] (Tr. at 63.) Based on these calculations, Toyobo's claims, if allowed in full, would constitute approximately twenty-five percent of the total unsecured claims pool. (Tr. at 69.) Under this scenario, ASM's $5,300,000 claim would represent only about one point five percent (1.5%) of the total unsecured claims. (Tr. at 86.)

---

[59] The Trustee's estimates assumed that Toyobo would not be entitled to a claim based on its allegations business defamation against Second Chance.

[60] This total assumed that other major unsecured claims would be allowed in the following amounts: $36,290,920 for the U.S. Claim, $84,500,000 for the German claims, $66,921,000 for the Class Claim, $19,600,000 for the trade claims (including the claim filed by ASM), and $40,000,000 for other vest claims. In making this calculation, the Trustee also assumed that a $70,000,000 claim filed by Aaron Westrick and a $760,000 claim filed by Second Chance Body Armor, Ltd. would be disallowed.

34

Boyd testified that the estate currently has approximately $21,500,000 on hand.   (Tr. at 68.)  If the settlement is not approved, and Toyobo's claims are allowed in full, Toyobo would be entitled to be paid twenty-five percent (25%) of this amount which is approximately $5,375,000.   ASM's distribution is estimated to be somewhere around $322,500.   By contrast, the total cash in the estate will increase to $26,500,000 if the settlement is approved.   After withdrawal of Toyobo's claims, the unsecured claims pool will shrink to approximately $247,458,000.  (Tr. at 68.)  Based on these numbers, ASM's claim will represent about two percent (2%) of the total unsecured claims and ASM will be entitled to a distribution of approximately $530,000.  (Tr. at 87.)  In sum, unsecured creditors, including ASM, will receive a higher percentage of a larger pool of money if the settlement is approved by this court.

At the conclusion of the evidentiary hearing on the Motion to Approve Settlement, the court took the matter under advisement.   Because this case has been consistently contentious, and based upon the possibility of an appeal, the court has opted for a written opinion rather than a typical oral bench opinion.

## VII.  DISCUSSION.

Bankruptcy Rule 9019(a) permits this court to approve a trustee's motion for settlement, after notice and a hearing. FED. R. BANKR. P. 9019(a).  The court notes that "[s]ettlements in bankruptcy cases are favored by law." Buckeye Check Cashing, Inc. v. Meadows (In re Meadows), 396 B.R. 485, 499 (Bankr. 6th Cir. 2008) (Gregg, J., concurring) (citing In re Cormier, 382 B.R. 377, 400-01 (Bankr. W.D. Mich. 2008)). Often, the "very purpose of such a compromise agreement 'is to allow the trustee and the

creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims.'" Bard v. Sicherman (In re Bard), 49 F. App'x 528, 530 (6th Cir. Oct. 15, 2002) (unpublished opinion) (quoting In re A & C Props., 784 F.2d 1377, 1380-81 (9th Cir. 1986)); see Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163 (1968) ("In administering [bankruptcy] proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts."). The advantages of settlement may be realized even in cases, such as this adversary proceeding, where trial has already commenced. "The point of a settlement is that everyone stops gambling and walks away from the table with some winnings (or at least fewer losses)." In re Doctors Hospital of Hyde Park, Inc., 474 F.3d 421, 430 (7th Cir. 2007).

Before approving a settlement under Rule 9019(a), the court must determine whether the proposed compromise is "fair and equitable."[61] TMT Trailer Ferry, Inc., 390 U.S. at 424, 88 S. Ct. at 1163; Reynolds v. Commissioner, 861 F.2d 469, 473 (6th Cir. 1988). This assessment requires the court to "apprise itself of the underlying facts and to make an independent judgment" as to whether proposed compromise meets this standard. Reynolds, 861 F.2d at 473 (citing In re American Reserve Corp., 841 F.2d 159, 162-63 (7th Cir. 1987)). "What is being sought is not the resolution of issues, but rather the

---

[61] The Bankruptcy Appellate Panel of the Sixth Circuit ("BAP") recently noted that although "published Sixth Circuit case law on Rule 9019 settlements is relatively sparse," the Court of Appeals and the BAP "have consistently reaffirmed their adherence to the 'fair and equitable' standard in unpublished opinions." Olson v. Anderson (In re Anderson), 377 B.R. 865, 871 (Bankr. 6th Cir. 2007), abrogated on other grounds by Schwab v. Reilly, __ U.S. __, 130 S. Ct. 2652 (2010).

36

identification and clarification of the litigation issues so that the [bankruptcy court] can make an informed decision on the reasonableness of the settlement." In re Bell & Beckwith, 93 B.R. 569, 574-75 (Bankr. N.D. Ohio 1988).

To evaluate the fairness and equity of the proposed settlement, the court must weigh four major factors:

(1) the probability of success in the litigation;

(2) the difficulties of collecting any judgment;

(3) the complexity of the litigation and the expense, inconvenience, and delay necessarily attending it; and

(4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

See TMT Trailer, 390 U.S. at 424, 88 S. Ct. at 1163; In re Bard, 49 F. App'x at 530 (unpublished opinion) (stating that the TMT Trailer standard is comprised of four distinct factors and citing an older case, Drexel v. Loomis, 35 F.2d 800, 806 (8th Cir. 1929)); Cook v. Terlecky (In re Cook), 336 B.R. 600, 2006 WL 13114, *3 (Bankr. 6th Cir. Jan. 4, 2006) (unpublished table opinion) (recognizing and applying the four factors); In re Quality Stores, Inc., 272 B.R. 643, 647-48 n.9 (Bankr. W.D. Mich. 2002) (recognizing the four factors regarding review of settlements).

The Trustee, as the party seeking approval of the Settlement Agreement, bears the burden of proving, by a preponderance of the evidence, that the agreement is fair and equitable. See In re A & C Props., 784 F.2d at 1381; Velde v. First Int'l Bank & Trust (In re Y-Knot Const., Inc.), 369 B.R. 405, 408 (Bankr. 8th Cir. 2007); In re Bell & Beckwith, 93 B.R. at 574. The ultimate decision to approve a settlement agreement is within the bankruptcy court's sound discretion. Fishell v. Soltow (In re Fishell), 47 F.3d 1168, *2 (6th

Cir. 1995) (unpublished table decision) (bankruptcy court's approval of a compromise is reviewed on appeal for abuse of discretion).

### A. The Probability of Success in the Litigation.

The circumstance of seeking approval of a settlement agreement after sixty-five days of trial, while probably not unique, is likely uncommon. After hearing testimony from twenty-five witnesses and reviewing hundreds of exhibits, the court is able to evaluate the Trustee's probability of success in this litigation with greater specificity than most adversary proceedings. It would be improper for the court to make any legal conclusions prior to the conclusion of the trial and in the context of the Motion to Approve Settlement. However, to evaluate the Trustee's probability of success in the litigation, the court is required to make some general observations about the Trustee's case and highlight some problematic elements with regard to each asserted cause of action.

### 1. General Observations.

As a preliminary matter, the court notes that the business relationship between Second Chance and Toyobo was somewhat unusual, especially regarding the Zylon product supply chain. Second Chance was not an end user of the Zylon-containing ballistic vests, but was a vest manufacturer that bought and then used Zylon in its products. The evidence at trial thus far shows that sales of Zylon were not made directly from Toyobo to Second Chance. Instead, Zylon sales occurred through an extended supply chain which included trading houses and weavers. Although Second Chance and Toyobo executed certain confidentiality and rebate/promotional agreements, there is no evidence of any bilateral written contract for the sale of Zylon directly from Toyobo to Second Chance. Despite this fact, Second Chance was not a typical "downstream" purchaser of Toyobo's

38

product. Indeed, the evidence shows that Second Chance and Toyobo worked together closely to develop Second Chance's Zylon vests, and considered themselves "partners" (in a non-legal sense) in their efforts. Toyobo also made direct representations about Zylon's properties and characteristics to Second Chance throughout their business relationship.

The nature of this relationship raises some legal analysis difficulties. For example, under current Michigan law, it is unclear whether purchasers may successfully maintain breach of warranty claims against a remote manufacturer if the parties are not in privity of contract. See, e.g., Pack v. Damon Corp., 434 F.3d 810, 818-20 (6th Cir. 2006) (noting, in an action brought by a mobile home purchaser against the vehicle's manufacturer, that the "Michigan Supreme Court has not yet ruled on whether privity is required to bring an implied warranty claim" under the Michigan UCC, but concluding, based on the relevant case law, that the Court "has abandoned the privity requirement for *implied-warranty* claims") (emphasis added); Heritage Resources, Inc. v. Caterpillar Fin. Servs. Corp., 774 N.W.2d 332, 341-42 (Mich. App. 2009) (concluding that Michigan law requires privity of contract "for a remote purchaser to enforce a manufacturer's *express warranty*") (emphasis added). If the settlement is not approved and trial continues, this court will be required to address this issue. If this court determines that privity is required under Michigan law, and was lacking between Second Chance and Toyobo, the Trustee's breach of warranty claims (particularly the express warranty claims) will probably fail.

Because the Trustee's fraud claims against Toyobo arose in a commercial context, relate solely to allegations that Zylon did not perform as well as anticipated, and seek damages for the purely economic losses that resulted from those alleged defects, the

39

economic loss doctrine also presents a major potential impediment to the Trustee's recovery. As applied in Michigan, the economic loss doctrine generally provides that "where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses." Neibarger v. Universal Cooperatives, Inc., 486 N.W.2d 612, 615 (Mich. 1992) (citations omitted). This definition, however, is deceptively simple. The application of the doctrine to the complicated facts of this case is not so straightforward.

The Trustee has argued, for example, that the economic loss doctrine only limits its remedies to those available under the Uniform Commercial Code and does not preclude fraud claims from being brought within the confines of the UCC. The Trustee further argues that his fraud claims are independent of his breach of contract claims, and therefore qualify for the "fraud in the inducement" exception recognized under Michigan law. See Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc., 532 N.W.2d 541, 545 (Mich. App. 1995). Finally, the Trustee somewhat persuasively asserts that application of the economic loss doctrine to alleged fraud claims in this case, which involve misrepresentations about a material used in a life-critical application like ballistic vests, would be contrary to public policy.

Again, if the Settlement Agreement is not approved, the court will have to determine scope of the economic loss doctrine and its potential applicability to the facts of this case. Because these issues are not well-settled under Michigan law, the outcome of this analysis is currently uncertain. If the court determines the economic loss doctrine applies, the Trustee's fraud claims could be completely barred.

## 2. Problematic Elements of the Main Causes of Action.

Even if the Trustee is able to overcome these general obstacles, the court believes that it will be extremely difficult, and perhaps impossible, for the Trustee to prove *all* elements of *any* of the causes of action that have been asserted against the Toyobo Defendants. Throughout this litigation, counsel for the Trustee has diligently struggled to uncover the relevant facts and to present those facts to the court. The evidence that has been presented thus far, coupled with the frustratingly evasive testimony of some of the Toyobo witnesses, has caused the court to be concerned about certain aspects of Toyobo's conduct.[62] But, concern – or even outrage – over a party's conduct does not justify ignoring the elements that must be established to prove a cause of action.[63] The court further recognizes that it may draw inferences with regard to particular elements based on circumstantial evidence. So far, the proofs submitted at trial leave the court with the strong impression that a large number of such inferences will be needed for the Trustee to prevail on any of his claims against Toyobo. While the court may be willing to draw a limited number of connecting inferences, it is not willing to infer an entire element or cause of action.

---

[62] Regarding some of the testimony of some of Toyobo's employees, the word "stonewalling" comes to mind. In fairness, the court notes that it was troubled by some of the testimony and the actions taken by representatives of Second Chance as well.

[63] In criminal cases, the power of the jury "to dispense mercy by nullifying the law and returning a verdict less than that required by the evidence" is called jury nullification. People v. Demers, 489 N.W.2d 173, 174 (Mich. App. 1992) (citation omitted). This court is not aware of any comparable concept that would allow for entry of a judgment that is not supported by the evidence in a bench trial.

### a. Breach of Warranty.

The breach of warranty claims asserted by the Trustee illustrate this point. To prevail on his warranty claims, the Trustee must first establish the existence of warranties regarding the Zylon fiber that was provided by Toyobo to Second Chance. Under Michigan law, such warranties may be expressly created by a seller[64] or may be implied by law under certain circumstances.[65] Next, the Trustee must prove that the Toyobo Defendants breached these warranties by providing Zylon which did not comply with the warranties at the time of sale, and that Second Chance suffered damages which were caused, proximately and in fact, by the alleged defects in the Zylon fiber. See James J. White & Robert S. Summers, Uniform Commercial Code § 9-1, 342 (5th ed. 2009).

---

[64] An express warranty is an affirmation of fact, promise, or description of goods, by the seller to the buyer that the goods will conform to the affirmation, promise or description, which becomes part of the basis of the bargain. See Mich. Comp. Laws Ann. § 440.2313. The Trustee alleges that Toyobo made five general types of express warranties about Zylon throughout its business relationship with Second Chance: (1) warranties that Zylon was superior in many ways to p-Aramid (Kevlar); (2) warranties that Zylon would provide higher ballistic performance fabric for body armor than p-Aramids (Kevlar); (3) warranties that Zylon could be used in ballistic vests; (4) warranties that Zylon could be used to make high strength, light weight, and comfortable fabric for protective garments; and (5) warranties that Zylon fibers were dimensionally stable against humidity. The Trustee cites several specific representations made by Toyobo in each of these categories.

[65] Under Michigan law, an implied warranty of merchantability – i.e., a warranty that the goods are fit for the *ordinary* purpose for which they are used – arises in commercial sales contracts, unless specifically excluded by the parties. Fargo Machine & Tool Co. v. Kearney & Trecker Corp., 428 F.Supp. 364, 371 (E.D. Mich. 1977); Mich. Comp. Laws Ann. § 440.2314. A warranty that goods are fit for a *particular* purpose may also be implied under Michigan law. Mich. Comp. Laws Ann. § 440.2315. To establish the existence of this implied warranty, the buyer must show that: (1) the seller had reason to know the buyer's particular purpose; (2) the seller had reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods; (3) the buyer, in fact, relied on the seller's skill or judgment. See James J. White & Robert S. Summers, Uniform Commercial Code § 9-10, 369-70 (5th ed. 2009).

The court believes that the Trustee has established some of the elements of his breach of warranty claims at trial thus far. For instance, there is ample evidence that Toyobo knew that the Zylon it sold was to be used in ballistic applications; specifically, Second Chance's bullet-resistant vests. Other aspects of the Trustee's warranty claims are problematic.

First, the Trustee must overcome Toyobo's argument that it disclaimed all warranties regarding Zylon fiber through various means.[66] Without deciding the specific effect of the purported disclaimers, the court notes that most of the communications between Toyobo and Second Chance contained general disclaimer language. The court further notes that at least two Second Chance representatives testified that fiber manufacturers did not typically warrant the performance of their fiber. These facts could preclude the Trustee's success on his breach of warranty claims.

Assuming the Trustee establishes that warranties existed regarding Zylon which were not disclaimed, he still faces the challenge of proving that Toyobo breached such warranties by providing Zylon that was defective at the time it was sold. This is questionable because the overwhelming evidence at trial was that, immediately after its manufacture, Zylon was markedly superior to other "super fibers" on the market in terms

---

[66] Under Michigan law, express warranties may be negated or limited, but only to the extent reasonable. Mich. Comp. Laws Ann. § 440.2316(1). The implied warranty of merchantability may be excluded or modified by language that mentions merchantability and, in the case of a writing, is conspicuous. Mich. Comp. Laws Ann. § 440.2316(2). The implied warranty of fitness for a particular purpose may also be excluded or modified if the exclusion is in writing and is conspicuous. Id. In addition, implied warranties may be excluded by language which calls the buyer's attention to the exclusion of warranties, by the buyer's examination of the goods, or by course of dealing, course of performance, or usage of trade. Mich. Comp. Laws Ann. § 440.2316(3).

of important physical properties like tensile strength and modulus. Zylon's short-coming was that it experienced strength degradation *over time*, particularly in conditions of heat and humidity.[67]   Therefore, to prevail on his breach of warranty claims, the Trustee must show that the defect in Zylon which caused it to be susceptible to strength degradation was inherent in the fiber from the time of its manufacture.  From a factual perspective, this requires complicated scientific proofs regarding the chemical structure of the fiber and the mechanisms by which hydrolytic degradation occurs.

Finally, the Trustee may have difficulty establishing that Toyobo's alleged breach of express and implied warranties was the proximate cause of the losses sustained by Second Chance. The evidence presented at trial establishes that the ballistic performance of a bullet-resistant vest is dependent on a variety of factors.  These factors include not only the physical properties of the fiber used to produce the vest, but also the methods by which the fiber is incorporated into the overall vest design.  The court believes it may infer from the evidence presented thus far that Zylon's relatively rapid and unpredictable loss of tensile strength in certain conditions was an important cause of the reduced ballistic performance observed in Second Chance's vests. This reduction in performance ultimately led to Second Chance's recall and caused damages to the company.  The court recognizes, however, that the relationship between tensile strength and ballistic performance is neither direct nor easy to quantify.  Accordingly, the element of causation may be problematic for the Trustee.

---

[67] The court also believes that the degradation of Zylon was inconsistent; some batches retained their strength and durability better than other batches, for unknown reasons.

b. Fraud.

Although this court is most enamored with the allegations of fraud, the Trustee also faces obstacles with his fraud claims.    To prevail on his claim for fraudulent misrepresentation, the Trustee must generally prove that: (1) Toyobo made a material misrepresentation; (2) the representation was false; (3) when Toyobo made the representation, Toyobo knew that it was false or made it recklessly, without knowledge of its truth or falsity; (4) Toyobo made the representation with the intention that Second Chance would act upon it; (5) Second Chance acted in reliance upon it; and (6) Second Chance suffered damages as a result.[68] See Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d 813, 816 (Mich. 1976) (citing Candler v. Heigho, 175 N.W. 141, 143 (Mich. 1919)) (additional citations omitted).   The Trustee bears the burden of proving each of these elements by clear and convincing evidence.[69]  Id. (citing Youngs v. Tuttle Hill Corp., 128 N.W.2d 472, 473 (Mich. 1964)).

---

[68] The Trustee's silent fraud claim requires proof of similar elements, except that instead of a material misrepresentation, silent fraud involves "the suppression of a material fact, which a party in good faith is duty-bound to disclose." M&D, Inc. v. McConkey, 585 N.W.2d 33, 37 (Mich. App. 1998) (quoting Lorenzo v. Noel, 522 N.W.2d 724 (Mich. App. 1994)) (additional citations omitted).   Innocent misrepresentation is also a "species of fraudulent misrepresentation," except that it does not require a showing of fraudulent intent on the part of the defendant and "has, as added elements, the necessity . . . that the unintendedly false representation was made in connection with the making of a contract and that the injury suffered as a consequence of the misrepresentation inure to the benefit of the party making the misrepresentation.  Id. at 37 (citing United States Fidelity & Guaranty Co. v. Black, 313 N.W.2d 77 (1981)).  Because the Trustee's fraud, silent fraud, and innocent misrepresentation claims face similar evidentiary and legal hurdles, the court need not distinguish between the types of fraud claims for purposes of this opinion.

[69] In his trial brief, the Trustee argues that his claims for negligent and innocent misrepresentation do not require intent to deceive and therefore, need only be proven by a preponderance of the evidence.  It is not necessary for the court to address this potential distinction for purposes of this opinion.

45

The evidence presented at trial so far has been wishy-washy with regard to some of these elements.  Specifically, the court believes it will be most difficult for the Trustee to establish that Second Chance reasonably relied on Toyobo's alleged misrepresentations and omissions regarding the properties and performance of its Zylon fiber.  The documents admitted into evidence show that Second Chance was skeptical about the relevance of Toyobo's accelerated aging data.  At the same time, other documents show that Second Chance solicited Toyobo's assistance in understanding and addressing Zylon's strength retention issues. The testimony from Second Chance's representatives was similarly inconclusive on these reliance issues.  However, the fact that Second Chance continued to pursue the German contracts, which required *ten-year warranty periods*, after being informed of Zylon's durability issues in the summer of 2001 undercuts the Trustee's ability to prove that Second Chance was relying on Toyobo's accelerated aging data and related representations regarding Zylon's strength retention.  There is also some evidence that Second Chance may have buried its head in the sand because some of its officers may have been more interested in a possible IPO.  Finally, as with the warranty claims, it will be difficult for the Trustee to establish that Toyobo's alleged misrepresentations regarding its Zylon fiber were the proximate cause of Second Chance's losses for purposes of his fraud claims.

### c.  Breach of Contract.

The Trustee's breach of contract claims are also problematic.  As noted previously, the parties in this case did not have a written contract providing for the sale of Zylon directly from Toyobo to Second Chance. Instead, the Trustee's Third Amended Complaint asserts that the parties had several informal agreements and contracts throughout their

business relationship.[70]  The Trustee alleges that Toyobo breached these contracts by, among other things, failing to provide Zylon that was suitable for use in ballistic vests, failing to deliver Zylon that met certain minimum specifications, failing to provide all pertinent information relating to Zylon, and failing to take responsibility for Zylon's "incurable defect," i.e., its susceptibility to hydrolytic degradation.

Toyobo argues that the Trustee's common law breach of contract claims are duplicative of his breach of warranty claims and are generally barred because the case is governed by the Uniform Commercial Code.  Assuming Toyobo is incorrect in this assertion, the court believes it will be difficult for the Trustee to establish that these alleged promises created binding contracts between Second Chance and Toyobo.[71]  Even if the Trustee succeeds in establishing the existence of valid and binding contracts, he must also prove that Toyobo breached those contracts and that Second Chance suffered damages as a result.  The Trustee's ability to prevail on these claims is questionable.

---

[70] The Third Amended Complaint identifies six separate agreements and contracts that were allegedly breached by Toyobo: (1) Toyobo's agreement to provide Zylon fit for use in ballistic vests; (2) two promotional contracts between Second Chance and Toyobo, in which Toyobo agreed to provide Zylon that was fit for use in ballistic vests; (3) two confidentiality agreements between Second Chance and Toyobo, in which Toyobo agreed to share pertinent information about Zylon with Second Chance; (4) minimum specification contracts, in which Toyobo agreed to deliver Zylon that met certain specifications regarding tensile strength, modulus, elongation at break and denier; (5) Toyobo's promise in an October 1, 1998 letter to Second Chance that it would be responsible for the qualities of Zylon fiber; and (6) Toyobo's promise in December 2001 to provide Second Chance with all pertinent information relating to Zylon (i.e., the Nojima promise).

[71] Under Michigan law, there must be an offer, acceptance, consideration and mutual assent for a valid contract to be formed.  See, e.g., Kirchhoff v. Morris, 275 N.W. 778, 780 (Mich. 1937) (Michigan law on contract formation requires an offer, acceptance and consideration); Kloian v. Domino's Pizza L.L.C., 733 N.W.2d 766, 770 (Mich. App. 2006) (A "contract requires mutual assent or a meeting of the minds on all the essential terms.") (citation omitted).

d. <u>Damages</u>.

The Trustee's Third Amended Complaint requests over $200 million in damages from the Toyobo Defendants.[72]  The Trustee generally asserts that the faulty Zylon produced by Toyobo, and the related breaches of warranty and misrepresentations, caused Second Chance to suffer both direct and consequential damages. These damages included vest claims against the company, extraordinary expenses, and ultimately, the complete destruction of Second Chance's business.  Although the Trustee has not yet offered his damage proofs at trial, the court notes that Toyobo has objected to the report of the Trustee's potential damages expert, Patrick O'Keefe, on a number of grounds.[73] Notwithstanding those objections, the court believes it will be extremely difficult for the Trustee to establish concrete, *non-speculative* damages in the asserted amounts. <u>See, e.g.</u>, <u>John E. Green Plumbing & Heating Co., Inc. v. Turner Constr. Co.</u>, 742 F.2d 965, 968 (6th Cir. 1984) ("A damage award must not be based on mere speculation, guess, or conjecture.") (citation and internal quotation marks omitted).

### 3.  ASM's "Hindsight" Argument and Conclusions regarding the Trustee's Probability of Success.

As demonstrated by the foregoing, the legal issues presented in the adversary proceeding are extremely complex.  The factual support needed to prevail on the various causes of action is equally complicated.  The relevant time period spans from the early

---

[72] <u>See</u> Trustee's Trial Brief at 191-92, AP Dkt. No. 472.

[73] The Toyobo Defendants filed a motion in limine to exclude O'Keefe's testimony. (AP Dkt. No. 345.)  Although that motion was eventually withdrawn, the withdrawal was without prejudice to Toyobo's ability to object to the expert testimony when it was offered at trial.

1990s through 2004. The case requires testimony from numerous witnesses and consideration of hundreds of documents. The evidence has included scientific information regarding, among other things, the chemical structure of PBO fiber, the mechanisms by which the alleged strength degradation may have occurred, the delicate and complex process by which Zylon was manufactured, the methods used to weave Zylon fiber into fabric, and how the fiber's physical properties and other factors, such as the design of the specific vest, affect ballistic performance.

The Trustee has presented these facts in a manner which, initially, raises serious concerns over Toyobo's actions. For example, the evidence suggests that, from the time of commercialization in 1998, manufacture of Zylon fiber was somewhat of a "work in progress." Even after Zylon's susceptibility to hydrolysis was brought to Toyobo's attention, and as its researchers struggled to understand and resolve the problem, Toyobo continued to market Zylon for use in life-critical applications like Second Chance's vests. The most compelling portion of the Trustee's cause of action appears to be that, despite their close working relationship, Toyobo failed to disclose all of the information it had learned about Zylon's degradation (specifically, the fiber from fabric test data) to Second Chance. However, as the proofs have come in, the difficulties faced by the Trustee have become increasingly apparent. With regard to the fiber from fabric data, for instance, it is unclear whether Toyobo had a legal duty to share that information with Second Chance. It is equally unclear whether Second Chance would have acted any differently in reliance on that data. (At this time, based upon Bachner and Davis' testimony, the court thinks there is not sufficient proof of the requisite reliance.) These types of issues present significant obstacles to the Trustee's ability to prove the requisite elements of his causes of action

49

against Toyobo. And even if the Trustee is able to prove some aspects of his case, the amount of damages he would be entitled to is highly questionable.

The legal and factual variables outlined above could lead to any number of possible outcomes in the litigation. Although the value of the cash payment and claims withdrawal under the Settlement Agreement may seem small as compared to the damages alleged in the complaint, the court is firmly convinced that the Settlement Agreement represents a reasonable outcome in light of the Trustee's probability of success in the litigation. The uncertainty surrounding the Trustee's ability to prevail on any of his claims weighs in favor of the proposed settlement.

The complexity and uncertainty of the issues presented also cause this court to totally reject ASM's assertion that the Trustee should have recognized the weaknesses in his case from the onset of the litigation and therefore, should have settled (or even abandoned) the case sooner. First, the court notes that the Trustee has been actively involved in assessing the strengths and weaknesses of the estate's claims against Toyobo from the time he was appointed as chapter 7 trustee. The Trustee relied on the opinions of various creditors and law firms, as well as his personal assessment of the claims, in determining to pursue the litigation against Toyobo. In fact, if the Trustee had abandoned the causes of action early in the litigation, he explained that such action would have almost certainly been met with strenuous objections from creditors. The Trustee also continually monitored the progress of the case throughout the discovery phase of the litigation. After the close of discovery, and prior to the beginning of trial, the Trustee and his attorneys sought advice about the case from two highly knowledgeable retired bankruptcy judges. Those judges advised the Trustee that the estate's claims against Toyobo appeared

colorable and were worth pursing.

Second, and more importantly, the Trustee's decision to settle the adversary proceeding at this time in the litigation is based not on what *could* happen at trial, but on what *has* happened at trial. The Trustee and his general counsel personally attended all but one or two of the sixty-five trial days. Consequently, the decision to enter into the Settlement Agreement was based on the Trustee's prior experience and first-hand observations of the trial as well as on consultation with his counsel. Some of the factors that influenced the Trustee's decision, such as the testimony of key witnesses, the exclusion of certain evidence, or the court's perceived reaction to certain facts, could not have been known prior to the beginning of trial. The court finds that the Trustee's perceptions of the progress of the case are reasonable. From the court's perspective, the Trustee appeared to have a much stronger case at the beginning of trial. Many of the potential deficiencies in the Trustee's proofs only became apparent as the evidence came in and the trial progressed.[74]

## B. The Difficulties of Collecting Any Judgment.

At the risk of making an understatement, the litigation between the Trustee and Toyobo has been hard-fought and sometimes bitterly contentious from its inception. The court agrees with the Trustee's assertion that collection of any judgment that might be entered against Toyobo is unlikely to be any easier than other aspects of the adversary proceeding. Collection efforts would be further complicated by the fact that Toyobo Co., Ltd. is a Japanese corporation and its principal place of business is in Osaka, Japan.

---

[74] It is the court's experience as an attorney and a judge that it is not uncommon for one to be surprised during the course of a trial.

Toyobo America, a wholly-owned American subsidiary of Toyobo Co., Ltd., is also a named defendant in the adversary proceeding.  However, the Trustee states that the assets of Toyobo America would likely be insufficient to satisfy a sizeable judgment if the Trustee were to prevail in the Toyobo litigation.  The court is not aware of any evidence thus far that would allow it to assess the accuracy of this belief.  However, to the extent the Trustee might be required to undertake collection in Japan, such efforts would likely be particularly difficult, time-consuming, and expensive.

As ASM points out, these potential difficulties should have been known to the Trustee from the outset of the Toyobo litigation.  Despite the fact that these considerations are not new, they remain relevant to the court's evaluation of the proposed Settlement Agreement.  The possible difficulty of collecting any judgment supports approval of the Trustee's Motion.

### C.   The Complexity of the Litigation and the Expense, Inconvenience and Delay Necessarily Attending It.

The litigation between the Trustee and Toyobo is unquestionably complex.  Some of the legal issues are like jigsaw puzzles with many pieces.  In addition to the highly complicated factual and legal issues presented by this adversary proceeding, the Trustee has encountered a variety of practical obstacles in pursuing his claims against the Japanese defendants. Because the Trustee reached a Settlement Agreement with Toyobo after sixty-five days of trial had been conducted, much of the expense, inconvenience, and delay associated with the litigation has already occurred.

Regardless, there are significant additional expenses, inconveniences and delays that can be avoided by approval of the Settlement Agreement.  For instance, if the

Settlement Agreement is not approved, an additional twenty-five to thirty-five days of trial will likely be required.[75]   Most of the Trustee's remaining witnesses are experts, which, according to the Trustee's estimates, will cause the estate to incur several hundred thousand dollars of additional expense if he were to complete the trial.   Given the complexity of the litigation and the volume of evidence, the court would likely need between six months and one year after the conclusion of the trial to issue a comprehensive written opinion and judgment.  After this court issues a final judgment, there would almost certainly be at least two appeals which would result in many more years of litigation.  During this time, interim distributions to creditors would be theoretically possible, but extremely difficult, due to the complicated claims issues involved in the case and the Toyobo Defendants' continuing objections to resolution of the U.S. and Class Claims.   Further, some consideration would be required about Toyobo's monetary claims and whether the estate should reserve funds until the appeals were finally completed.

In contrast, if the Settlement Agreement is approved, the $5 million will be promptly paid to the estate by the Toyobo Defendants.  After this occurs, there will be no remaining estate assets to be collected.  The Toyobo Defendants will no longer be parties in interest and will not have standing to object to the various proofs of claims.  Based upon prior status conferences, the court believes that many large claims settlements are now circling like airplanes at a busy airport that will soon be able to land when the runway is cleared. Barring unforeseen events, the Trustee estimates that approval of the settlement will allow

---

[75] Prior to execution of the Settlement Agreement, a total of ninety-nine trial days were scheduled through August, 2011.

the case to be closed and the money to be distributed to creditors by the end of 2011.

The court finds that this factor weighs very substantially in favor of approving the proposed Settlement Agreement. The Trustee's recovery under the Settlement Agreement may not be as sizeable as ASM and other creditors had hoped, but approval of the agreement will allow the estate to avoid additional expense, inconvenience, and delay to pursue complex litigation which might ultimately be unsuccessful. There is significant value to creditors in a certain recovery and a prompt distribution.

### D.  The Paramount Interest of the Creditors and a Proper Deference to Their Reasonable Views in the Premises.

The scheduling order entered by this court on February 24, 2011, gave creditors and parties in interest the opportunity to object to the proposed Settlement Agreement.  ASM is the *only* creditor which filed an objection.

Under the broad umbrella of the "interests of creditors," ASM's Limited Objection raises a novel argument.  ASM asserts that until the large claims in this bankruptcy case are quantified and the amounts of legal fees are established, the Trustee's statements regarding the value of the proposed settlement are merely *estimates*.  Essentially, ASM argues that neither the creditors nor the court can determine whether the settlement is in the best interests of the estate until the amount of each creditor's "piece of the pie" is known with certainty.  ASM further asserts that the Trustee's estimates regarding the value of the proposed settlement, particularly the withdrawal of Toyobo's claims, are based on faulty assumptions.  At the hearing on the Motion to Approve Settlement, ASM pointed out that the Trustee's calculations failed to account for expenses incurred in the litigation and suggested repeatedly that the Trustee had overvalued Toyobo's potential claims when

calculating the value of the claims withdrawal. The court finds these arguments to be without merit.

First, the question to be answered by this court in evaluating the proposed Settlement Agreement is whether the settlement represents a "fair and equitable" resolution of the underlying adversary proceeding – i.e., whether the amount of the settlement with Toyobo is reasonable in relation to the strength of the Trustee's claims in the litigation and the costs of pursuing those claims. The validity and amount of individual proofs of claim against the estate – i.e., how the estate's assets may be divided and distributed later – is not relevant to this portion of the analysis.[76] Accordingly, ASM's arguments regarding the value of the settlement in relation to other claims in the case are

---

[76] The Seventh Circuit Court of Appeals reached a similar conclusion in In re Doctors Hospital of Hyde Park, Inc., 474 F.3d 421 (7th Cir. 2007). The creditor in Doctors Hospital objected to the settlement of various claims brought by the debtor hospital against the doctor who was its former owner and sole shareholder and several other defendants. Although the creditor believed the estate's recovery against the doctor could be as high as $80 million, the parties' settlement agreement only required the doctor to pay $6.1 million to the estate, waive his $9 million dollar claim and other smaller claims against the estate, and assist the estate in resolving certain other claims. The creditor objected to this settlement on the grounds that it was unreasonably low. Among other arguments, the creditor asserted that the bankruptcy court erred in approving the settlement because the proponents of the settlement improperly provided the court with information about the value of the settlement in relation to the claims of other creditors in the case. Because of this "improper comparative information," the creditor argued that the bankruptcy court could not have exercised its independent judgment to assess the value of the settlement. Id. at 430-31.

Evaluating the settlement agreement under the Seventh Circuit's "best interests of the estate" test, which involves consideration of factors similar to those utilized under the Sixth Circuit's "fair and equitable" standard, the court affirmed the bankruptcy court's approval of the settlement. The Seventh Circuit concluded that the bankruptcy court had properly focused its analysis on the range of possible outcomes in the litigation between the parties to the settlement. The validity and amount of claims filed by other creditors in the case was not relevant to this determination and was properly excluded from the bankruptcy court's analysis of the settlement agreement.

rejected.

Similarly, this court can determine that the proposed settlement is in the best interests of the creditors and will benefit the estate without quantifying the exact value of the Toyobo claims withdrawal. At the hearing on the Motion to Approve Settlement, the Trustee estimated that Toyobo's claims against the estate are worth approximately $85 million. Even if Toyobo's claims are worth only a small fraction of this amount, as ASM seems to suggest, withdrawal of the claims provides a benefit to the estate. Assuming that Toyobo's claims have some value, unsecured creditors like ASM will receive a larger distribution if those claims are withdrawn. And even if the Toyobo claims have no value, the estate will receive a $5 million cash payment from Toyobo as a result of the Settlement Agreement. The payment will be *now* rather than perhaps many years from now. This immediate and certain payment will result in the estate having more funds to distribute to creditors than it would have in absence of the settlement. In short, approval of the Settlement Agreement will allow unsecured creditors, including ASM, to receive a higher percentage of a larger amount of money, regardless of what the exact numbers may turn out to be.

Accordingly, after considering the views of the creditors, including ASM, as the only objecting creditor, the court concludes that approval of the Settlement Agreement is in the best interests of creditors and that the settlement will provide significant benefit to the bankruptcy estate. This factor weighs in favor of approval of the proposed settlement.

## VIII.  CONCLUSION.

The Trustee and his attorneys have been diligent and have worked extremely hard, indeed tirelessly, in pursuing this litigation.  ASM's argument that the litigation should not have been commenced, and its implicit related assertions that the litigation expenses should not have occurred, is unwarranted.  The proposed settlement is fair and equitable.

For the foregoing reasons, ASM's Limited Objection to the Trustee's Motion to Approve Settlement is OVERRULED and the Motion is GRANTED.  A separate order shall be entered accordingly.

Dated this 5th day of July, 2011
at Grand Rapids, Michigan

Honorable James D. Gregg
Chief United States Bankruptcy Judge