UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

Case No: GT 04-12515

SCBA LIQUIDATION, INC.,
f/k/a SECOND CHANCE BODY ARMOR, INC.,

Chapter 7

Debtor.

_____/

## OPINION REGARDING GERMAN STATES' OBJECTION TO THE INCLUSION OF STATE STATUTORY AND POLICE POWER CLAIMS IN CLASS PROOF OF CLAIM NO. 666

Appearances:

Daniel K. Reising, Esq., Portland, Oregon, attorney for the German Free State of Bavaria and the German State of North Rhine-Westphalia.

Geoffrey Silverman, Esq., and Karin F. Avery, Esq., West Bloomfield, Michigan, attorneys for Steven W. Lemmings, et al.

Cody H. Knight, Esq., Kalamazoo, Michigan, and Ronald A. Schuknecht, Esq., Traverse City, Michigan, attorneys for James W. Boyd, Chapter 7 Trustee.

## I. INTRODUCTION.

Prior to its bankruptcy filing, Second Chance Body Armor, Inc. ("Second Chance" or the "Debtor") manufactured and sold bullet-resistant concealable body armor to various individuals and entities, including many law-enforcement officers and agencies. After concerns arose about the performance of some of its bullet-resistant vests, particularly those containing Zylon fiber, various vest purchasers and State Attorneys General initiated legal actions against Second Chance and the manufacturers of the Zylon fiber, Toyobo Co. Limited and Toyobo America, Inc. (collectively, "Toyobo"). The actions against Second Chance were stayed when the company filed a voluntary chapter 11 petition on October 17, 2004.

Approximately one year later, this Court issued an order certifying a class (the "Class Certification Order") through which purchasers and users of Second Chance's Zylon vests could assert claims against the Debtor. The Class was limited to breach of warranty claims, and specifically excluded other claims for violation of statute and punitive or exemplary damages. The Class also excluded claims asserted by States' Attorneys General ("State AGs") exercising their police powers.

The case was converted to chapter 7 on November 22, 2005, and James W. Boyd was appointed as the Chapter 7 Trustee ("Trustee"). In the years that followed, the Trustee undertook the arduous process of administering Second Chance's bankruptcy estate. Among other things, the Trustee sold the Debtor's business and pursued lengthy, contentious litigation of Second Chance's breach of warranty and fraud claims against Toyobo.[1] Numerous proofs of claim were filed against the Debtor's bankruptcy estate by individuals and entities who had purchased Second Chance's Zylon vests, the United States, the State AGs, and the Class. The Trustee filed objections to many of these claims and engaged in extensive negotiations with the governmental entities and Class Counsel in an effort to accurately identify vest purchasers and prevent duplicate recoveries.

Finally, in the summer of 2012, this court approved a Class Notice Program which required potential class claimants to file claims with the Class by a date certain. Eight states[2] that had not previously filed proofs of claim against the bankruptcy estate filed

---

[1] After sixty-five days of trial, the Trustee and Toyobo reached a settlement agreement. The Trustee's claims against Toyobo and the resulting settlement are addressed in detail in this court's opinion approving the settlement. In re SCBA Liquidation, Inc., 451 B.R. 747 (Bankr. W.D. Mich. 2011) (Dkt. Nos. 2514 and 2515.).

[2] The eight states that filed claims with the Class are Alabama, Florida, Georgia, Idaho, Mississippi, Ohio, Tennessee, and Wisconsin.

2

claims with the Class.  On August 9, 2012, the German Free State of Bavaria and the German State of North Rhine-Westphalia (collectively, the "German States") filed an Objection to the Inclusion of State Statutory and Police Power Claims in the Class Proof of Claim No. 666 (the "Objection").  The German States' Objection asserts that the claims of six of these states -- Alabama, Florida, Georgia, Mississippi, Ohio, and Tennessee (collectively, the "Six State Claims") -- seek recovery on behalf of all vest purchasers in each respective state.  Although the Six State Claims seek breach of warranty damages relating to actual vest purchases, the German States argue that such representative claims may only be filed pursuant to each state's consumer protection statute, which in turn, derives from the state's police powers.[3]  Therefore, the German States assert that the Six State Claims constitute statutory or police power claims which fall outside the Class definition and may not be included in the Class Claim.

For the reasons set forth below, the court rejects the German States' proposed construction of the Class Certification Order and overrules the German States' Objection.

---

[3] The German States did not object to the claims filed by Wisconsin and Idaho because those claims specifically identified the police departments within each state that purchased the vests.  Thus, the German States viewed the Wisconsin and Idaho claims as "claim[s] being presented by the chief law enforcement officer of the state for vest purchase[s] by law enforcement agencies within the state."  (See German States' Memorandum of Law on Timing, Waiver, and Standing, Dkt. No. 3615, at 9-10.)  The German States assert that these constitute breach of contract claims by vest purchasers or their designated representative, and therefore are properly included in the Class Claim. (Id.)

## II. FACTS AND PROCEDURAL BACKGROUND.

### A.   General Background.

The general factual background of this bankruptcy case has been recounted in numerous pleadings and court opinions[4] and is not disputed in this contested matter.  In 1999, Second Chance began selling concealable body armor containing Zylon, a "super fiber" manufactured by Toyobo.  Zylon was thought to be an excellent material for use in ballistic applications because it had superior physical characteristics but was lighter, softer, and more flexible than traditional aramid fibers, like Kevlar.  Over time, Second Chance manufactured three models of Zylon vests:  the Ultima and Ultimax vests, which were made entirely from Zylon, and the Tri-Flex vests, which contained Zylon mixed with other aramid fibers.  Because Second Chance's Zylon vests were lighter and more comfortable than other ballistic vests on the market, initial sales of the vests were hugely successful.  The vests were sold to federal, state and local law enforcement agencies, as well as to military personnel and individual officers.  Some of these vest purchases were funded by a United States government program called the Bulletproof Vest Partnership Act (the "BVPA"), through which the federal government reimbursed certain vest purchasers for a portion of the purchase price of certain vests.  Each Second Chance vest included a five year express warranty.[5]

---

[4] See, e.g., In re SCBA Liquidation, Inc., 451 B.R. 747 (Bankr. W.D. Mich. 2011) (opinion approving settlement of Toyobo litigation); Claimants' Motion for Class Certification, Dkt. No. 268; Debtor's Brief in Opposition to Claimants' Motion for Class Certification, Dkt. No. 330.

[5] The express warranty was extended to original users and purchasers only and was governed by Michigan law. See Class Claimants' Supplemental Memorandum in Support of Class Certification, Dkt. No. 376, at 5-6.

In 2001, concerns arose regarding the durability of Zylon, particularly in hot and humid conditions.  Subsequent testing suggested that Second Chance's Zylon vests might be losing strength faster than expected and might not provide adequate ballistic protection for the entire five year warranty period.  In 2003, Second Chance announced a recall and remedial program for its Ultima and Ultimax vests.

Despite the recall, a large number of State AGs and classes of consumers began filing lawsuits against Second Chance and Toyobo.  One of the largest lawsuits was a class action filed against Second Chance and Toyobo in Oklahoma state court (the "Oklahoma Class Action").  These lawsuits, along with the costs of the recall program, caused Second Chance to file a petition under chapter 11 of the Bankruptcy Code on October 17, 2004.

B.    The Motion for Class Certification.

On April 5, 2005, shortly after the commencement of Second Chance's bankruptcy case, Steven W. Lemmings and the City of Prior Creek (the "Class" or "Class Claimants") filed a putative class proof of claim (the "Class Claim").  (Claim No. 666; Class Exh. F.)[6] The Class Claimants also filed a Motion for Class Certification on April 5, 2005.  (Dkt. No. 268.) As originally proposed, the Class was broadly defined to consist of "all persons and entities in the United States and its territories, who have purchased, possess(ed), or own(ed) a bulletproof vest manufactured by the Debtor, Second Chance Body Armor, Inc.,

---

[6] Where possible, citations herein are to the court's docket.  If a document is not a part of the court's docket, or if cross-reference is helpful for clarity, citations are to the party's exhibits, e.g., "Class Exh. __" or "German States' Exh. __." All of the parties' exhibits were admitted into evidence at the evidentiary hearings on the German States' Objection. (See Transcript of Evidentiary Hearing held on November 27, 2012, Dkt. No. 3634, at 13-14;Transcript of Adjourned Evidentiary Hearing held on January 2, 2013, Dkt. No. 3647, at 5.)

which contains Zylon®, a fiber manufactured and sold by Toyobo Company, Ltd. and Toyobo America, Inc." (Id.) This broad definition contained limited exclusions for affiliates of the Debtor and Toyobo, vest distributors, those who opted out, and holders of personal injury claims. (Id.) The only government claims excluded under the proposed definition were the claims of the federal government. (Id.)

The damages sought in the original Class Claim consisted of "breach of warranty claims (both express and implied), damages for fraudulent misrepresentation and omissions in connection with the marketing and sale of the vests (consumer fraud), treble damages (where available), punitive damages (where available), interest, costs, and any other damages available to the Class Claimants." (Claim No. 666; Class Exh. F, n.3.) The Class Claim estimated that there were as many as 150,945 potential Class members. (Id.) This estimate was based on the total number of Second Chance Zylon vests sold to consumers in the United States from 1999 through 2004. (Id.) Utilizing this number of vests, the putative Class estimated that the total amount of the breach of warranty claims alone could total $188,281,250.00. (Id.)

C.    *Hearing on the Motion for Class Certification.*

The Debtor and the Unsecured Creditors' Committee both filed responses in opposition to the Motion for Class Certification and a hearing was held before this court on May 17, 2005. (Dkt. Nos. 329 & 330.) At the hearing, counsel for the Debtor provided some additional background regarding the status of the case. He explained, for example, that a working group consisting of the various State AGs had been formed, and that the group had been in "constant communication" with the Debtor and its counsel. (Transcript of Hearing held on May 17, 2005, Dkt. No. 373, at 61.) The Debtor's attorney emphasized

6

that the State AGs were filing representative claims through which they were "asserting rights to recover for all of the people in their state." (Id. at 62.)  As of the date of the hearing, three states had filed such representative proofs of claim, but the Debtor's attorney indicated that he expected the "majority of AGs" would file similar claims prior to the expiration of the bar date.  (Id. at 63.)

With regard to the Motion for Class Certification, Debtor's counsel acknowledged that the Debtor would not contest its liability for the breach of express warranty claims relating to the Ultima and Ultimax vest models.  (Id. at 58.)  He argued, however, that the variety of other claims asserted by the Class might be subject to state law variations and, as such, would be inappropriate for resolution in the context of a class proof of claim.  (Id. at 54-56.)

Counsel for the Class countered these arguments by asserting that a class proof of claim was the best way to ensure that the interests of the "little guys," i.e., individual vest purchasers, were adequately represented in the bankruptcy case.  Class counsel explained that "one of the things that [came] through loud and clear" during the hearing was that "the little guy, the little consumers" were "not going to be adequately protected by the Unsecured Creditors Committee." (Id. at 23.)  He further stated that, of the 150,000 vest claimants identified by the Class, only a "handful" of individual claimants had filed their own claims against Second Chance's bankruptcy estate.  (Id. at 39.)

The court shared both the Debtor's concerns about the breadth of the proposed Class and the Class's concerns about adequate representation of individual vest purchasers.  Specifically, the court stated that individual vest purchasers might not pursue breach of warranty claims on their own, and that class certification would likely result in

"many more people participating and getting what they are entitled to." (Id. at 80-81.) The court commented that there were "some good points made about class certification" when it came to "representing the little guy . . . to make certain that all creditors get their share." (Id. at 79.)

Seeking a compromise and a practical solution, the court inquired whether counsel had considered crafting a more narrow class that would facilitate recovery for breach of express warranty clams, but would leave those claimants who wanted to "try for triple damages" under specific state law theories to do so outside of the Class. (Id. at 99.) The court explained:

> If the decision would be a big class involving lots of state law issues and treble damages and . . . all the rights that you may otherwise have outside of the class, I'd be disinclined to certify a class.
>
> If it's a class that . . . just deals with core issues that are going to be readily determinable and it looks like it's going to move quickly and it's going to be fair and just overall . . . [and] give some rough justice to everybody, I'm leaning that way. I'm kind of in favor of that.

(Id. at 104-05.)   The court encouraged Class counsel to "come up with some sort of reasonable proposal" for certification of a narrowed class.   (Id. at 108.)   The court commented:

> And I'll tell you if it really goes to the express warranty issues and recovering on that basis, I'm going to be listening to you real closely.  To the extent you get into state law, you're going to lose my interest.

(Id.)

Because of the Debtor's financial situation, counsel for the Class agreed that the case was "essentially an express warranty case" and that narrowing of the Class definition might be appropriate. (Id. at 92-94.) Class counsel further suggested that the State AGs were likely to support a Class comprised of breach of warranty claims, but that reservations

for the exercise of certain governmental police powers might have to be considered. (Id.

at 101-02.) Accordingly, the court adjourned the hearing to give the parties time to discuss

revising the Class definition.

D.    *The Class Certification Order.*

The parties' negotiations were successful, and on October 6, 2005, the court

entered a stipulated Order Granting Motion for Class Certification (the "Class Certification

Order"). (Dkt. No. 625.)  The order certified a Class consisting of:

> All persons and entities in the United States and its territories, who have
> purchased or used a bulletproof vest manufactured by Second Chance Body
> Armor, Inc., which contains Zylon®, a fiber manufactured and sold by
> Toyobo Company, Ltd. and Toyobo America, Inc. *Excluded from the Class
> are* Second Chance Body Armor, Inc., Toyobo Company, Ltd., Toyobo
> America, Inc., their affiliates, parents and subsidiaries; all directors, officers,
> agents, and employees of any of the foregoing; any distributors of Second
> Chance Body Armor, Inc.; any person or entity who timely opts out of this
> proceeding; any person with present or future personal injury claims; *any
> claims of state attorneys general exercising their police powers* [referred to
> herein as the "Police Powers Exclusion"]; and any claims belonging to the
> federal government . . . .

(Id. at ¶ A) (emphasis added.)  The order further provided that the "Class is *limited to*

*breach of warranty claims, and shall expressly exclude any and all claims for violation of*

*statute and/or punitive or exemplary damages, including by not limited to any and all claims*

*for penalties or civil penalties brought by any State Attorney General on behalf of*

*consumers*" (referred to herein as the "Breach of Warranty Limitation").  (Id.)

E.    *Amendments and Objections to the Class Claim.*

After entry of the Class Certification Order, the Class filed an amended proof of

claim on December 21, 2005 (the "First Amended Class Claim").  (Claim No. 666; Class

Exh. DD.)  In contrast to the original Class Claim, which was based on the broad definition

9

initially proposed by the Class, the First Amended Class Claim reflected the narrowed Class definition agreed to by the parties and adopted by the court in the Class Certification Order. (Id. at n.1.) Despite this narrowing, the total number of vests referenced in the First Amended Class Claim -- 50,945 -- remained the same. (Id. at n.3.) Using an estimated purchase price of $1,200 per vest, the First Amended Class Claim asserted total breach of warranty claims of approximately $181,134,000. (Id.)

The Trustee filed an objection to the First Amended Class Claim on July 17, 2009. (Dkt. No. 1997.) The Trustee's objection focused on two main aspects of the Class Claim. First, the Trustee asserted that the amount of the Class Claim should be calculated using an average cost per vest of $750, rather than the $1,200 figure asserted by the Class. (Id. at ¶ 14.) Second, and more problematically, the Trustee noted several developments that complicated identification of Class members and presented the potential for duplication of claims. For instance, the United States filed a proof of claim against the Debtor's bankruptcy estate, a portion of which related to payments made to vest purchasers under the BVPA. (Claim No. 932.) To the extent the Class Claim sought recovery for the full purchase price of an individual vest, and the United States also sought recovery for the BVPA amount reimbursed to the vest purchaser, the claims of the federal government and the Class potentially overlapped. (See, e.g., Trustee's Objection to Class Claim, Dkt. No. 1997 at ¶ 15-16, Motion for Approval of Class Notice Program, Dkt. No. 3307, at ¶ 4.)

In addition, although the filing of the bankruptcy case stayed the Oklahoma Class Action against Second Chance, the lawsuit continued postpetition against Toyobo. A settlement was ultimately reached in that lawsuit (the "Oklahoma Settlement") and approximately $29 million was distributed to the vest purchasers who were members of the

Oklahoma class. (Trustee's Objection to Class Claim, Dkt. No. 1997 at ¶ 9-10 and 15, Motion for Approval of Class Notice Program, Dkt. No. 3307 at ¶ 5.) Again, to the extent that a vest purchaser received funds from the Oklahoma Settlement and was also eligible to be included in the Class Claim in this case, potential for duplication of recoveries existed.

Other potential overlaps with the Class Claim occurred when individual purchasers and entities filed direct proofs of claim against the Debtor's bankruptcy estate. For instance, twenty states, acting through their State AGs, filed proofs of claim against the estate (the "State Claims"). (See, e.g., Claim Nos. 473 and 934 filed by the State of Texas.) Each claim asserted damages for vests purchased in the respective state, either by individuals and law-enforcement agencies directly or by wholesalers and distributors who sold vests to individuals and law-enforcement agencies (the "Damage Portion"). The claims also asserted damages for various civil penalties and costs (the "Penalty Portion"). The Trustee filed objections to the State Claims in September 2011. (See, e.g., Objection to Claim No. 473 and Claim No. 934 filed by the State of Texas, Dkt. No. 3057.) In his objections, the Trustee asserted that the Damage Portions of the State Claims were duplicative of the Class Claim and of individual claims filed in the bankruptcy cases. The Trustee also argued that the Penalty Portions of the State Claims should be subordinated under § 726(a)(4) of the Bankruptcy Code.[7]

To resolve these potential problems, the Trustee's objection to the First Amended Class Claim suggested the number of Class members be re-calculated and reduced. The

---

[7] The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive. The specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

Trustee asserted that total number of Zylon vests sold by Second Chance should be the starting point. From this number, vests sold to the United States should be subtracted, as the United States was specifically excluded from the Class under the Class Certification Order. The Trustee also stated that the number of vests included in the Class Claim should be reduced to the extent that separate proofs of claim for those vests had been filed by individuals or entities against the Debtor's estate. The Trustee's objection did not assert that the State Claims were excluded from the Class under the Police Powers Exception or the Breach of Warranty Exclusion, but only that duplication of such claims should be avoided. Finally, the Trustee argued that amounts received by Class members under the Oklahoma Settlement and BVPA should be deducted from the total amount of the Class Claim.

In November 2009, a trial of the Trustee's breach of warranty and fraud claims against Toyobo commenced in this court. Sixty-five days of demanding and contentious trial were held before a settlement agreement was reached in February 2011. Over objection by a creditor, this court approved the settlement of the adversary proceeding in a written opinion and order issued on July 5, 2011. (In re SCBA Liquidation, Inc., 451 B.R. 747 (Bankr. W.D. Mich. 2011); Dkt. Nos. 2514 and 2515.)

After dismissal of the Toyobo adversary proceeding, the Class Claimants filed a Second Amended Class Claim on August 23, 2011. (Claim No. 666; Class Exh. G.) The Second Amended Class Claim was based on the same total number of vests as the previous claims, but reflected an agreement with the Trustee that $750 was the appropriate average cost per vest to be used in calculation of the amount claimed. (Id. at ¶2.) The Second Amended Class Claim also included deductions for amounts received by Class

12

members under the Oklahoma Settlement and the BVPA. With these adjustments, the total amount of the Class Claim was reduced to $113,208,750.

The Trustee filed a second objection to the Class Claim on September 30, 2011. (Dkt. No. 3097.) The German States also filed objections to the Class Claim, and to the proofs of claim filed by individual Class members, on September 30, 2011. (Dkt. Nos. 3108 and 3109.) Again, both the Trustee's and the German States' objections to the Class Claim focused on the average price per vest to be used in calculating the claim and on preventing the potential for duplicate recoveries among Class members. Neither objection specifically asserted that representative claims filed by the States must be excluded from the Class under the Class Certification Order. In fact, it is noteworthy that the German States' objections characterized the Class definition in a manner which suggests that all breach of warranty claims, including those brought by State AGs on behalf of vest purchasers, would be included in the Class. After quoting the Class definition, the German States explain:

> Thus, each and every claimant in this proceeding whose claim is based upon the purchase and use of a bulletproof vest in the United States and its territories, and who is not the United States government is a member of the Class.
>
> . . . .
> Based on the definition of the Class . . . , the only claimants who are not Class members are: A. Foreign purchasers/users of vests, like Bavaria and NRW; B. Axel Bierbach, the insolvency Administrator of the Second Chance Body Armor GmbH; C. the United States; and D. claimants whose claims are not premised upon the purchase or use of vests.

(Dkt. No. 3109, at ¶ 7 and 11.)

Beginning in early 2012, several status conferences were held regarding the objections to the Class Claim and the State Claims. With regard to the State Claims, the

13

Trustee, Class Counsel and the various State AGs engaged in extensive negotiations over a proposed settlement of Trustee's objections to the State Claims. Under the proposed settlement, the Damage Portion of each State Claim would be re-calculated to prevent potential duplications, allowed as a general unsecured claim, and paid through the Class. The Penalty Portions of the State Claims would also be amended, allowed, and subordinated pursuant to § 726(a)(4) of the Bankruptcy Code.

F.    *The Class Procedures Motion.*

The parties also undertook efforts to identify Class members and further narrow the outstanding issues regarding the Class Claim. On January 31, 2012, the Class Claimants filed a Motion for Approval of Class Notice Program, Authorization to Engage Notice Consultants and Support Vendor, Approval of Claim Form, Approval of Adjustment of Individual Class Member Claims, and Approval of Notice Procedures Regarding Class Claim Administration (the "Class Procedures Motion"). (Dkt. No. 3307.) Among other things, the Class Procedures Motion proposed a mechanism by which potential Class Claimants would be notified of the certification of the Class and their eligibility to participate in the Class. The motion further requested that each potential Class Claimant be required to file a claim form with the Class by a date certain. With regard to the State claims, the motion states that the court's Class Certification Order "permits claims of States to be part of the Class, to the extent that they are not based upon the exercise of police powers. Many States assert claims in part based upon breach of warranty (which may properly be within the Class) and in part upon exercise of police powers (which would be excluded)." (Class Procedures Motion, Dkt. No. 3307, at ¶30.) The motion states that a "number of States have indicated their desire to file their breach of warranty claims and/or their

14

restitution claims, at a value of $750.00 per vest, through the Class and to receive distribution through the Class, although not becoming a Class member." (Id. at ¶34.)

The Trustee filed a limited objection to the Class Procedures Motion which raised minor technical issues. (Dkt. No. 3332.) The German States also filed a response to the Class Procedures Motion. (Dkt. No. 3337.) In their response, the German States stated that, apart from the issues raised in the Trustee's limited objection, they did not object to the "housekeeping" and administrative aspects of the motion. (Id. at ¶ 20.) The German States asserted that the Class Procedures Motion should not be construed as dispositive of the substantive issues raised by the Class Claim. (Id.) To that end, the German States' response raised "protective" objections to several aspects of the Class Procedures Motion. (Id.)

A hearing on the Class Procedures Motion was held before this court on February 27, 2012. During the hearing, the court stated that any decision regarding the Class Procedures Motion would be "without prejudice for the German States or the [T]rustee, or, for that matter, the [S]tates" to raise issues "about the number of vests, the application of payments or credits for the Oklahoma settlements" or any other substantive issue regarding the Class Claim. (Transcript of Hearing held on February 27, 2012, Dkt. No. 3586, at 23.) The court permitted counsel for the Class Claimants to briefly address the "protective" objections raised by the German States. One of the issues addressed was the potential for the States to receive distributions through the Class, and that such distributions not be based on a State's exercise of its police powers. Counsel for the Class explained:

15

Some of the states do have direct purchase claims that are based on that state buying a vest and which would be a breach of warranty type claim. Some of the states through their police power have both . . . a restitution claim as well as other penalty claims. The restitution claim again is based -- although it is a police power claim -- is based on individual vests that were purchased within the state . . . . It is, I believe, clear in our materials, and it is certainly the consensus of all the states we've talked to and the [T]rustee, that anything that is not based on a vest purchase that is in fact a punitive or exemplary damage, or the like, will be treated as a subordinated claim as the [C]ode contemplates and not within this restitution group . . . .

[P]olice power . . . would be yes as to individual vests but no as to any sort of penalty or punitive damages or exemplary damages.

(Id. at 26-28.) The court explained that Class counsel's statement was consistent with the court's understanding of the proposed treatment of the State Claims: "anything to do with a penalty or non-compensatory damages for purchases of the vests . . . was tentatively going to be treated as a subordinated claim. But the consequential direct damages from the purchase of a vest or vests were going to be treated differently." (Id. at 27-28.)

At the conclusion of the hearing, the court approved the Class Procedures Motion with modifications as stated on the record, and with the understanding that approval was without prejudice to the future adjudication of any substantive objections to the Class Claim. An order approving the motion was entered by the court on March 6, 2012. (Dkt. No. 3395.)

G.    Resolution of the States' Representative Proofs of Claim.

By May 2012, the Trustee had reached stipulations with nineteen of the State AGs who had filed claims against the Debtor's bankruptcy estate.[8] Consistent with the parties'

---

[8] The State of California was the only state that filed a proof of claim and failed to respond to the Trustee's objection. Notwithstanding California's failure to respond, the Trustee asked the court to treat California's claim consistently with the other State Claims. Accordingly, the court entered an order (the "California Order") disallowing California's

16

previous discussions, the stipulations provided that the Damage Portion of each State Claim was to be re-calculated and allowed as a general unsecured claim. However, for "administrative purposes," the Damage Portion was to be "satisfied pursuant to the payment process established for the Class Claim in the Bankruptcy Case." (See, e.g., Order Approving Stipulation Resolving Claim No. 473 and Claim No. 934 filed by the State of Texas, Dkt. No. 3464.) The Penalty Portions of the State Claims were also amended, allowed, and subordinated for distribution pursuant to § 726(a)(4). (Id.) The German States did not object to the resolution of the nineteen State Claims or to their payment through the Class Claim. (See German States' Memorandum of Law on Timing, Waiver, and Standing, Dkt. No. 3615, at 8.)

H.     *The Six State Claims and the German States' Objection.*

After receiving the notice required by the Class Procedures Motion, eight states that had not previously filed proofs of claim against the Debtor's bankruptcy estate filed claims with the Class. The State of Florida filed a claim for "7783 Total vests purchased in Florida," indicating that the claim was made "on behalf of Florida Purchasers." (Class

---

claim against the bankruptcy estate but providing that "the State of California shall have a claim within the Class . . . but shall not be deemed to be a Class Member." (See Order Granting Objection to Claim No. 304 filed by the People of the State of California, Dkt. No. 3567.) The German States filed a motion for clarification and/or reconsideration of the California Order on August 9, 2012. (Dkt. No. 3580.) The court denied the German States' motion in a written opinion and order entered on October 22, 2012. (In re SCBA Liquidation, Inc., 485 B.R. 153 (Bankr. W.D. Mich. 2012); Dkt. Nos. 3618 & 3619.) In its written opinion denying the German States' motion for reconsideration, the court explained:

> Although the language of [the California Order] differed from the stipulated orders entered with regard to the other State Claims – California's claims were disallowed against the bankruptcy estate while the other State Claims were allowed – *the end result was the same. Each State Claim, including California's claim, is to be paid through the Class.*

(Id. at 158) (emphasis in original).

Exh. A.) The State of Georgia, also acting "on behalf of Georgia purchasers" filed a claim

for "3,623 total vests sold in Georgia." (Class Exh. B.) The State of Mississippi filed a

claim for 483 vests. (Class Exh. C.) The State of Ohio filed a claim for 4,421 vests "on

behalf of Ohio purchasers." (Class Exh. D.) The State of Alabama completed an online

claim form for 349 vests, and the State of Tennessee filed an online claim form for 348

vests.[9] Two other states, Wisconsin and Idaho, filed claims with the Class, but identified

specific police departments within their states that had purchased vests.[10]

The German States filed their objection to six of these states' claims -- Florida,

Georgia, Mississippi, Ohio, Alabama and Tennessee -- on August 9, 2012.[11] (Dkt. No.

3579.) As previously noted, the German States' Objection asserts that although the Six

State Claims seek damages for breach of express warranty, the only basis for the Six

---

[9] Because the Tennessee and Alabama claims were submitted electronically, hard copies of these claims are not available and were not included among the Class's original exhibits. On January 23, 2013, the parties submitted a stipulation to augment the evidentiary record relating to the German States' Objection to the Class Claim. (Dkt. No. 3650.) Pursuant to the stipulation, the affidavit of Melissa D. Eisert of Rust Consulting, Inc., the claims administrator for the Class, was added to the evidentiary record. (Dkt. No. 3648.) The Eisert affidavit includes a copy of the template used by claimants when filing electronic Class Claims, and a copy of a spreadsheet showing the actual information provided by the States of Alabama and Tennessee when completing their online claim forms. (Id. at Exhs. A & B.) The spreadsheet indicates that these two states identified the "classmember that purchased vests" as "Tennessee Consumers" and the "State of Alabama – Assistant A.G. Noel Barnes," respectively. (Id. at Exh. B.)

[10] See, e.g., Representative Claim filed by the State of Wisconsin, Attached as Exh. 1 to the Declaration of Daniel K. Reising in Support of [German States'] Objection to State Police Power and Statutory Claims, Dkt. No. 3622.

[11] The German States did not object to the claims filed by Wisconsin and Idaho because the German States believe those claims are "direct claims on behalf of the state itself as opposed to either representative or vicarious claims." (See Transcript of Hearing held on July 25, 2012, Dkt. No. 3593, at 24.)

18

States to file such representative claims on behalf of consumers is each state's consumer protection statute. The German States contend that these consumer protection statutes derive from each state's police powers. Therefore, the German States argue that the Six State Claims are excluded from the Class under the Class Certification Order and, more specifically, the Police Powers Exception and the Breach of Warranty Exclusion.

On August 17, 2012, the German States, Class Counsel, and the Trustee filed a Joint Statement of Issus raised by the German States' Objection. (Dkt. No. 3581.) The court subsequently entered a scheduling order bifurcating the issues. (Dkt. No. 3583.) On November 27, 2012, a hearing was held on the issues of timing, waiver and standing. After the hearing, the court entered an interlocutory order holding that the German States have standing to object to the Class Claim and to inclusion of the claims of the State Class Claimants within the Class; (2) that the German States' Objection to the Class Claim is timely; and (3) that the German States have not waived their objection to the inclusion of the claims of the State Class Claimants in the Class. (Dkt. No. 3632.)

A continued evidentiary hearing on the remaining issues raised in the German States' Objection was held on January 2, 2013. After the hearing, the parties submitted supplemental legal memoranda and their stipulation to augment the evidentiary record. (Dkt. Nos. 3650, 3651, 3652.) The court then took the matter under advisement.

### III.  ISSUE.

The general issue presented is whether the Six State Claims, which assert breach of warranty damages for specific vests on behalf of vest purchasers within each state, may be included in the Class Claim or whether such representative claims are excluded from the Class under the Class Certification Order.

19

## IV. JURISDICTION.

The court has subject matter jurisdiction over this bankruptcy case and this contested matter.  28 U.S.C. § 1334.  The case and all related proceedings have been referred to this court for decision.  28 U.S.C. § 157(a) and L.R. 83.2(a) (W.D. Mich.).  The German States' Objection is a core proceeding because it involves the "administration of the estate" and the "allowance or disallowance of claims against the estate."  28 U.S.C. § 157(b)(2)(A) and (B).  This opinion constitutes the court's findings of fact and conclusions of law.  FED. R. BANKR. P. 7052.

## V. DISCUSSION.

From the court's perspective, the dichotomy created by the Class Certification Order is clear and unambiguous: breach of warranty claims stemming from the purchase of Zylon vests, whether brought by individual vest purchasers or by states on behalf of individual purchasers, are to be included in the Class.  Other types of claims, including those for fines, penalties or punitive damages, are not.  Under this construction, which was the court's intention when it certified the Class, the fact that the Six State Claims, which seek breach of warranty damages relating to specific vests purchased by consumers within each state, may be included in the Class Claim is self-evident.

In their Objection, the German States assert an entirely different and overly technical interpretation of the Class Certification Order.  The German States argue that the distinction drawn by the Class Certification Order is not between breach of warranty claims and other claims for fines, penalties, and punitive damages, but instead is between claims brought pursuant to an individual state's police powers or consumer protection statute and those that are not.  More specifically, although the German States acknowledge that the

20

Six State Claims seek breach of warranty damages relating to vest purchases within each state, the German States argue that the only basis for the states to bring such representative claims is under their consumer protection statutes and/or through exercise of their police powers. According to the German States, such statutory or police power claims are excluded from the Class under the Class Certification Order. This recently developed and highly technical interpretation of the Class Certification Order is at odds with the court's long-standing construction of the order and requires the court to examine its consistent interpretation of the order in greater detail.

A.    *Interpretation of the Class Certification Order.*

Like other written documents, unambiguous court orders are to be enforced as written. See In re Dow Corning Corp., 456 F.3d 668, 676 (6th Cir. 2006) (confirmed plan of reorganization is to be interpreted using general contract principles) (citations omitted). However, if a court order is "susceptible of two interpretations, it is the duty of the court to adopt that one which renders it more reasonable, effective and conclusive in the light of the facts and the law of the case." Hendrie v. Lowmaster, 152 F.2d 83, 85 (6th Cir. 1945) (quoting Pen-Ken Gas & Oil Corp. v. Warfield Natural Gas Co., 137 F.2d 871, 885 (6th Cir. 1943)); see also In re Dow Corning Corp., 456 F.3d at 676 ("A term is deemed ambiguous when it is 'capable of more than one reasonable interpretation.'") (quoting Miller v. United States, 363 F.3d 999, 1004 (9th Cir. 2004)).

When a court construes its own order, the meaning of the order should "be determined by what preceded it and what it was intended to execute." Hendrie, 152 F.2d at 85 (quoting Union Pac. R.R. Co. v. Mason City & Fort Dodge R.R. Co., 222 U.S. 237, 247, 32 S.Ct. 86, 90 (1911)). *The "most important factor in determining the meaning is the*

21

*intention of the judge who entered the order."* Zevitz v. Zevitz (In re Zevitz), 230 F.3d 1361, 2000 WL 1478371 (6th Cir. Sept. 28, 2000) (unpublished table decision) (emphasis added) (citing In re Doty, 129 B.R. 571, 588 (Bankr. N.D. Ind. 1991)).  For this reason, a trial judge's interpretation of his or her own order is given substantial deference on appeal.  See Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 n.4, 129 S.Ct. 2195 (2000) ("a bankruptcy court's interpretation of its own confirmation order is entitled to substantial deference") (collecting cases); Satyam Computer Servs., Ltd. v. Venture Global Eng'g, LLC, 323 F. App'x 421, 430 (6th Cir. Apr. 9, 2009) (unpublished decision) (an appellate court typically defers to the trial court's "interpretation of its order and reviews for abuse of discretion because the [trial] court 'is obviously in the best position to interpret its own order'") (citation omitted); In re Dow Corning Corp., 456 F.3d at 676 ("a bankruptcy court's interpretation of its own decisions" is given "significant deference").

The German States' Objection challenges the understanding of the Class Certification Order that has been held by the court, the Class, the Trustee, and the State AGs since entry of the order more than seven years ago.  The German States' Objection also raises a colorable potential ambiguity in the order's terms.  Accordingly, the court has decided to summarize a detailed analysis of the history of the Class Certification Order, the intended meaning of the Police Powers Exception and the Breach of Warranty Limitation, and the legal basis for the Six State Claims.

B.   *History of the Class Certification Order.*

The history of this bankruptcy case, and the circumstances that resulted in entry of the Class Certification Order, resolve any asserted ambiguities in the order's provisions.  Throughout this case, the court has repeatedly expressed its intention to ensure that all

22

creditors were treated equally and that the interests of the "little guys" -- the individual police officers, firefighters, and other first responders who purchased the recalled Second Chance vests -- were adequately represented and universally protected. As illustrated by the comments of the parties and the court at the hearing on the Motion for Class Certification, this goal was the driving force behind certification of the Class. The court believed certification of a class would provide a relatively simple mechanism through which claimants, particularly those who might lack the knowledge or economic incentive to file their own claims against the Debtor's bankruptcy estate, could assert their breach of warranty claims for faulty vests. At the same time, the court did not want resolution of the Class Claim to be unduly complicated or confused by other types of claims (such as claims for fines, penalties, and other types of punitive damages) that might be subject to variations in state law and unique types of proofs.

Accordingly, the court encouraged the parties to narrow the Class definition in a way that might balance these competing interests. Specifically, the court suggested crafting a Class that would include breach of express warranty claims, but would exclude all other types of claims. This distinction was referenced repeatedly at the hearing on the Motion for Class Certification. The court bluntly stated that it would be "disinclined" to certify a class "involving lots of state law issues and treble damages" but would be in favor of certifying a more narrow class that would deal with "core" breach of warranty issues and might "give some rough justice to everyone."[12] Counsel for the Debtor indicated that the Debtor would not contest liability for breach of express warranties, at least with regard to

---

[12] Transcript of Hearing held on May 17, 2005, Dkt. No. 373, at 104-05.

23

two of the Zylon vest models manufactured by Second Chance.[13]   Class Counsel also agreed that the case was "essentially an express warranty case."[14]

Importantly, when the issue of class certification was being argued and considered, neither the parties nor the court distinguished between breach of warranty claims brought by individual vest purchasers and breach of warranty claims brought by the State AGs on behalf of individual purchasers.   At the hearing on the Motion for Class Certification, Debtor's counsel informed the court that several State AGs had already filed representative claims against the bankruptcy estate and indicated that a majority of other states were likely to file similar claims in the future.[15]   Although the legal focus for such representative claims was not considered in detail, no party objected to the States filing such claims.

C.   Intended Meaning of The Breach of Warranty Limitation and Police Powers Exception.

Given the historical perspective and the record in this case, it is easy to discern the intended meaning of the language in the Class Certification Order.   The order establishes a class comprised of purchasers and users of Second Chance's bullet-resistant Zylon vests.   Unlike the broad Class definition originally proposed by Class counsel, the Class Certification order limits the Class to breach of warranty claims.   Therefore, the order "expressly exclude[s] any and all claims for violation of statute and/or punitive or exemplary damages, including but not limited to any and all claims for penalties or civil penalties

---

[13] Id. at 58.

[14] Id. at 92-94.

[15] Id. at 62-63.

24

brought by any State Attorney General on behalf of consumers."[16]   In hindsight, the German States argue that this language excludes representative breach of warranty claims filed by State AGs because the legal authority for such claims derives, at its core, from state consumer protection statutes.   Such a distinction was never contemplated nor intended by the court.   The intent of the Breach of Warranty Limitation was to exclude claims for violation of state consumer protection statutes, *but only to the extent such claims sought damages for liability other than breach of warranty*.   Simply put, breach of warranty claims were to be included within the Class and other types of claims were not. Accordingly, this court concludes that the Six State Claims are not excluded from the Class under the Breach of Warranty Limitation.

The Police Powers Exclusion served a similar purpose.   Under the Police Powers Exclusion, "any claims of state attorneys general exercising their police powers" are also excluded from the Class.[17]   The term "police powers" is not defined in the Class Certification Order.   The phrase "police and regulatory power" does, however, appear in § 362(b)(4) of the Bankruptcy Code.   Although the Bankruptcy Code definition of "police and regulatory powers" is not controlling for purposes of the Class Certification Order, the general understanding of the phrase in bankruptcy cases is helpful when considering the intended meaning of the "police powers" phrase in the order.

---

[16] Class Certification Order, Dkt. No. 625 at ¶ A.

[17] Id.

25

Section 362(b)(4) provides that certain actions by governmental units and entities are excepted from the automatic stay, when such actions constitute "enforcement of such governmental unit's or organization's police and regulatory power." For purposes of § 362(b)(4), the phrase "police or regulatory power" generally refers to "the enforcement of state laws affecting health, welfare, morals, and safety, but not regulatory laws that directly conflict with control of the res or property by the bankruptcy court." Javens v. City of Hazel Park (In re Javens), 107 F.3d 359, 367 (6th Cir. 1997) (quoting In re Missouri, 647 F.2d 768, 776 (8th Cir. 1981)). To determine whether a governmental action constitutes an exercise of "police or regulatory power" under § 362(b)(4), the Sixth Circuit Court of Appeals applies a "pecuniary purpose test" and a "public policy test." See Chao v. Hospital Staffing Servs., Inc., 270 F.3d 374, 385 (6th Cir. 2001).[18] These complementary tests "are designed to sort out cases in which the government is bringing suit in furtherance of either its own or certain private parties' interest in obtaining a pecuniary advantage over other creditors." Id. at 389 (citation omitted) (emphasis in original).[19] Under these standards,

---

[18] The "pecuniary purpose test," requires courts to consider "whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety." Chao, 270 F.3d at 385 (quoting Word v. Commerce Oil Co. (In re Commerce Oil Co.), 847 F.2d 291, 295 (6th Cir. 1988)) (additional citations omitted). Only "proceedings which relate primarily to matters of public safety are excepted from the stay" as exercises of governmental "police or regulatory powers." Id.

The "public policy" test requires courts to "distinguish between proceedings that adjudicate private rights and those that effectuate public policy." Id. at 385-86. Actions taken to "effectuate a public policy" constitute an exercise of police powers and are excepted from the automatic stay. Id. at 386.

[19] The legislative history of § 362(b)(4) suggests that the police powers exception to the automatic stay applies "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws" or is "attempting to fix damages for violation of such a law." H.R.

26

"an action will only be exempt from the automatic stay" as an exercise of police or regulatory powers "if the action has been instituted to effectuate the public policy goals of the governmental entity, as opposed to actions instituted to protect the entity's pecuniary interest in the debtor's property or to adjudicate private rights." Id. at 386. Accordingly, an action will be regarded "as outside the police power exception" when it "incidentally serves public interests but more substantially adjudicates private rights."[20] Id. at 390.

The Six State Claims represent the precise type of governmental action described by the Sixth Circuit as falling outside the police powers exception to the automatic stay. The Six State Claims are representative breach of warranty claims filed by the state governmental entities on behalf of private citizens. Although the Six States have a public policy interest in ensuring payment of warranty claims and compliance with state consumer

---

Rep. No. 595 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6299; S. Rep. No. 989 (1977), as reprinted in 1978 U.S.C.C.A.N. 5787, 5838. However, the standards utilized by the Sixth Circuit demonstrate that application of § 362(b)(4) is not dependant on the *type* of law underlying the governmental action, but on the *purpose* of the law that the governmental entity is seeking to enforce.

[20] In discussing this aspect of the public policy test, the Sixth Circuit explained that the existence of the test "naturally presumes that some suits by governmental units, even though they would effectuate certain declared public policies, will nevertheless be regarded as largely in furtherance of private interests." Chao, 270 F.3d at 389. The court suggested that:

An extreme example of such would be a suit by a state attorney general on behalf of a supplier against its debtor-customer to enforce a contract obligation. Although the suit would effectuate the state's public policy in favor of enforcing contractual obligations or requiring payment of damages, the suit essentially enforces the supplier's private rights against the debtor and would result in a pecuniary advantage to the state-favored supplier vis-a-vis other creditors of the debtor's estate.

Id.

27

protection laws, the primary purpose of the Six State Claims is adjudication and protection of the private rights of individual vest purchasers.

This court concludes that the term "police powers" in the Class Certification Order should be construed consistently with the general understanding of the term in bankruptcy cases. The Six State Claims would not constitute an exercise of "police powers" for purposes of § 362(b)(4). Likewise, the Six State Claims are not excluded from the Class by the Police Powers Exception.

D.    *Subsequent Construction of the Class Certification Order.*

The intended distinction between breach of warranty claims and other types of claims is also evident in pleadings filed, actions taken, and statements made after entry of the Class Certification Order. First, although the Class Claim has been amended several times, the total number of vests has remained constant. The original Class Claim, which was filed before entry of the Class Certification Order and utilized the broad definitions initially proposed by the Class, was based on a total of 150,945 vests. That total number of vests did not decrease in the First Amended Class Claim, even though the amended claim was filed after the Class definition had been significantly narrowed by entry of the Class Certification Order. If the Class believed that representative breach of warranty claims filed by the State AGs were excluded from the Class under the Class Certification Order, it would have reduced its vest claims accordingly.

Second, although the Trustee has raised various objections to the Class Claim, he has never argued that the representative breach of warranty claims filed by the State AGs are excluded from the Class. The Trustee's objections to the Class Claim have focused

28

on the average price per vest and on preventing duplication of recoveries. Specifically, the Trustee objected to the Class Claim to the extent it included the vest claims of entities, whether individuals or States, who had also filed direct proofs of claim against the bankruptcy estate. There would have been no reason for the Trustee to object to such overlapping claims if he believed that all representative state claims were excluded from the Class. The Trustee also advocated adjusting the calculation of the claim to account for amounts paid under the BVPA and the Oklahoma Settlement. Again, the Trustee would not have suggested that the BVPA amounts paid to the States should be deducted from the Class Claim if he had believed that all representative state claims were excluded from the Class.

Finally, and perhaps most importantly, the resolution of the Trustee's objections to proofs of claims filed by the State AGs against the bankruptcy estate is wholly consistent with this court's prior statements and the court's interpretation of the Class Certification Order. The stipulated orders resolving these claims generally provided that the Damage Portion of each State's representative claim -- i.e., the portion of the claim that related to breach of warranty or restitution for actual vests purchased in the respective state -- was allowed against the estate and was to be paid through the Class. The portion of the claims that asserted other civil penalties and costs was subordinated under § 726(a)(4).

The court recognizes that these State Claims technically differ from the Six State Claims because they were filed directly against the bankruptcy estate, rather than through the Class. However, in the universe of vest claims, there is no meaningful distinction between the two. To the extent the States' representative claims seek breach of warranty damages on behalf of individual vest purchasers, whether against the bankruptcy estate

29

or through the Class, the claims should be allowed. There is no reason to treat the Six States differently than the treatment given to all the other States.

E.   *Legal Basis for the Six State Claims.*

As illustrated by the foregoing discussion, until the German States filed their Objection to the Six State Claims, neither the court nor the parties recognized any potential difference between breach of warranty claims brought by individual vest purchasers and breach of warranty claims brought by States on behalf of individual purchasers. At the time the Class Certification Order was entered, the State AGs were actively involved in representing consumer interests in the bankruptcy case. Several State AGs had already filed representative claims against the Debtor's bankruptcy estate, and the court was advised that other representative State Claims were likely to follow. The court did not focus on any explicit legal basis for the representative State Claims, but to the extent the claims asserted breach of warranty theories, the court took it for granted that valid claims would be allowed and paid, either directly from the bankruptcy estate or by their inclusion in the Class.

The German States' Objection challenges the court's prior assumption. Specifically, the German States argue that the *only* possible legal authority for the representative breach of warranty claims filed by the Six States is each state's consumer protection statute and/or police powers. The Six States have not yet been given the opportunity to address this issue.[21]   In addition, even if some of the Six State Claims are based on

---

[21]   At a status conference held before this court on July 25, 2012, the Assistant Attorney General for the State of Texas urged the court to give notice to the Six States, so they would have the opportunity to appear and be heard on this issue. Because the court firmly believed that the Class Certification Order permitted the Six State Claims to be

30

consumer protection statutes or police powers, this court has determined that such claims are not excluded from the Class under the Class Certification Order, when the order is interpreted in light of its intended meaning and the circumstances surrounding its entry.

Notwithstanding, the Class has suggested two bases, other than state consumer protection laws, that would permit the Six States to file representative breach of warranty claims with the Class on behalf of individual vest purchasers: the doctrine of *parens patriae* and Bankruptcy Rule 2018. The court acknowledges that neither of these theories directly permits the states to file representative proofs of claim. However, under the unique facts and circumstances of this case, the court concludes that both theories support the conclusion that the Six States may file representative breach of warranty claims, under this particular Class Certification Order.

1.    The *Parens Patriae* Doctrine.

The Class argues that the States have the ability to file representative proofs of claim under the doctrine of *parens patriae*. Translated literally, *parens patriae* means "parent of the country." Alfred L. Snapp & Son, Inc. v. Puerto Rico, 458 U.S. 592, 600, 102 S.Ct. 3260, 3265 (1982). The doctrine gives a state standing to "act on behalf of its citizens" if the state's "quasi-sovereign interests are implicated." Kelley v. Schlater (In re Schlater), 40 B.R. 594, 596 (Bankr. E.D. Mich. 1984); see Snapp, 458 U.S. at 600-01, 102 S.Ct. at 3265. Quasi-sovereign interests "are not sovereign interests, proprietary interests,

included in the Class, the court declined to impose unnecessary costs and delay by requiring the Six States to respond to the German States' Objection.

If this court's interpretation of the Class Certification Order is reversed and remanded, the Six States will be given the opportunity to appear and be heard on these issues before any adverse decision is entered against them. In the court's view, to do otherwise would violate the Six States' due process rights.

or private interests pursued by the State as a nominal party." Snapp, 458 U.S. at 602, 102 S.Ct. at 3266. Instead, for a quasi-sovereign interest to exist, "the State must articulate an interest apart from the interests of particular private parties" such as its interests in ensuring the "health and well-being -- both physical and economic -- of its residents in general." Snapp, 458 U.S. at 607, 102 S.Ct. at 3268-69. The injury alleged by the State must apply to a "sufficiently substantial segment of its population," although both the injury to an identifiable group of people and the "indirect effects of the injury" may be considered. Snapp, 458 U.S. at 607, 102 S.Ct. at 3269. The Supreme Court has explained:

> One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.

Snapp, 458 U.S. at 607, 102 S.Ct. at 3269.

In bankruptcy cases, the doctrine of *parens patriae* has most often been invoked to give state attorneys general standing to file nondischargeability actions on behalf of injured or defrauded citizens, even in the absence of a direct debt to the state entity. See, e.g., New York v. DeFelice (In re DeFelice), 77 B.R. 376 (Bankr. D. Conn. 1987) (Attorney General for the State of New York had standing to bring nondischargeable debt action on behalf of consumer creditors); In re Schlater, 40 B.R. 594 (Bankr. E.D. Mich. 1984) (Michigan Attorney General had *parens patriae* standing to bring nondischargeable debt action against corporate and individual debtors accused of defrauding purchasers of health spa memberships). These cases frequently cite the state's consumer protection laws as evidence of the state's quasi-sovereign interest in protecting the economic well-being of consumers through the filing of a nondischargeability action. In re DeFelice, 77 B.R. at 380

32

(New York's consumer protection statute is an attempt to protect the state's citizens from consumer fraud; "the state's interest in vindicating its consumer protection laws in its courts is directly linked to its attempt to block the discharge of listed debts in [the bankruptcy court]"); In re Schlater, 40 B.R. at 596-97 (the applicability of parens patriae "is even stronger in this proceeding because the Michigan legislature has acted to prevent a class of injuries to the welfare of its citizens by enacting the Consumer Protection Act;" the "Attorney General is thus seeking to protect Michigan residents from fraudulent and deceptive practices under a mandate from the state legislature addressing this specific type of injury") (emphasis in original).

The court has been unable to locate any written opinion which has utilized the doctrine of parens patriae as a basis for states to file representative proofs of claim. However, the same considerations that give rise to parens patriae standing in nondischargeability cases support the conclusion that parens patriae gives the Six States authority to file representative breach of warranty claims with the Class. Although the primary purpose of the Six State Claims is to protect the economic interests of individual vest purchasers, the claims also represent an attempt to protect the States' quasi-sovereign interest in ensuring the general economic well-being of all consumers. Application of this doctrine under these specific facts permit the Six States to protect "the little guys." Further, the Six States should be permitted, within the bankruptcy system, to protect their police, firefighters and first responder citizens who purchased the recalled vests.

33

2.      Bankruptcy Rule 2018.

The Class also asserts that the representative claims filed by the Six States are authorized under FED. R. BANKR. P. 2018.  Rule 2018(b) provides:

> In a chapter 7, 11, 12, or 13 case, the Attorney General of a State may appear and be heard on behalf of consumer creditors if the court determines the appearance is in the public interest, but the Attorney General may not appeal from any judgment, order, or decree in the case.

The Advisory Committee Note explains that this rule "specifically grants the appropriate state's Attorney General the right to appear and be heard on behalf of consumer creditors when it is in the public interest." FED. R. BANKR. P. 2018 (Advisory Committee's Note).  The Note explicitly states that "consumer creditors" would include "individuals who purchased or leased property [for personal, family or household use] in connection with which there may exist claims for breach of warranty."  Id.[22]

Thus, Bankruptcy Rule 2018 generally permits state attorneys general to intervene and participate in bankruptcy cases on behalf of consumer creditors.  Although the rule does not specifically permit state attorneys general to file proofs of claim on behalf of citizens, at least one court has cited the rule as authority for such representative claims. In re U.S. Fidelis, Inc., 481 B.R. 503 (Bankr. E.D. Mo. 2012).  The Debtor in U.S. Fidelis was a corporation formed by "two scam artist brothers with prior criminal histories" which marketed vehicle service contracts to consumers. Id. at 507-08.  When the Debtor finally collapsed due to "high cancellation rates" and the brothers "treating [it] as their own personal ATM," it faced investigations by various state attorneys general for "deceptive

---

[22]The court recognizes that one might argue that use of the bullet resistant vests might be characterized as "work" or "employment" purposes.  In reply, one can respond "what is more 'personal' than protecting one's life?"

34

trade practices and other issues." Id. at 508. In its written opinion overruling an objection

filed by three creditors and confirming the chapter 11 plan filed by the Unsecured Creditors'

Committee as the result of a global settlement, the U.S. Fidelis court discussed the

involvement of the various state attorneys general in the case:

> The Attorneys General are authorized to participate and intervene on behalf
> of the consumer creditors under Rule 2018(b), and have played a critical role
> in representing those consumer creditors.
>
> . . . .
>
> The Attorneys General filed proofs of claim, and several obtained authority
> to cast ballots on behalf of their constituencies.  The presence of the
> Attorneys General gave the Court comfort that the interests of the consumer
> creditors were being vigorously pursued, allaying  concerns that the Court
> had voiced at the beginning of the Case [about protecting the interests of the
> victims of the Debtor's malfeasance].

Id. at 518.  The court further explained:

> State attorneys general are empowered under federal bankruptcy law to
> intervene on behalf of the consumer creditors for a reason: to ensure that the
> legal process results in the best possible resolution for the consumers
> without burdening each consumer with active participation (otherwise, many
> consumers would be marginalized, as meaningful participation may require
> personal legal expertise and sufficient resources to personally participate, or
> the financial wherewithal to obtain counsel to participate).

Id.  Accordingly, for purposes of confirmation, the U.S. Fidelis court concluded that the

support of the various attorneys general for the plan established the affirmative consent

of consumer creditors to the plan's terms.

Although the U.S. Fidelis decision involved confirmation of a chapter 11 plan, this

court believes that the statements about the participation of state attorneys general and

the value of permitting states to file representative claims apply with equal force in this

case.  As in U.S. Fidelis, the State AGs have played a critical and valuable role in this

case: monitoring the proceedings; protecting the interests of individual vest purchasers;

35

and assuring that otherwise unrepresented individuals will have easy access to this court to receive compensation for their breach of warranty claims. The State AGs have filed representative proofs of claim, both against the estate, or (as with the Six State Claims) with the Class. The representative claims against the estate have been allowed. Many of those allowed claims will be paid through the Class as requested by most of the other States. There is no reason to treat the Six State Claims any differently. Under the unique facts of this case, the court concludes that Bankruptcy Rule 2018 permits the Six States to file representative breach of warranty claims with the Class. See also FED. R. BANKR. P. 1001 (The Bankruptcy Rules "shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding.")

F.     *Modification of the Class Certification Order.*

As a final alternative, the Class argues that the court may modify the Class Certification Order to clarify the fact that representative breach of warranty claims filed by the States may be included in the Class. Under the applicable rules, an "order that grants or denies class certification may be altered or amended before final judgment." FED. R. CIV. P. 23(c)(1)(C) (incorporated by reference in FED. R. BANKR. P. 23); see also Powers v. Hamilton County Public Defenders Comm'n, 501 F.3d 592, 619 (6th Cir. 2007) (trial courts "have broad discretion to modify class definitions").

Given this court's interpretation of the Class Certification Order, modification of the Class definition is not required at this time. However, if it becomes necessary to modify the Class definition in the future to make it crystal clear that the Six States' representative breach of warranty claims may be included in the Class, the court will revisit the request

36

and very likely modify the Class definition to reflect what the court, and other parties (except the German States), intended.

## VI. CONCLUSION.

The court acknowledges that the legal principles that govern this matter are somewhat nebulous. The German States' highly-technical construction of the Class Certification Order, when considered only in isolation, is not without some limited merit. However, when the order is viewed in context of the overall architecture of this case, the court is firmly convinced that representative breach of warranty claims such as the Six State Claims were included and were intended to be included in the Class definition.

Furthermore, the German States are not harmed by this court allowing the Six States to file representative claims with the Class. To the contrary, denying compensation to the Six States and their individual citizens would be a windfall to the German States and some other creditors. From the first day, the court has expressed a desire to treat all States (and for that matter, all other entities) equally. This bankruptcy case has gone on for too long and it is past the time to make a final distribution to the purchasers of the recalled vests. All valid breach of warranty claims that are allowed should be paid as quickly as possible.[23]

---

[23]During its many hearings and status conferences, the court pushed the Trustee and all other parties in interest to complete this case as quickly as possible. But for the German States' objection (and another one which is now pending), final distributions would have been completed in late 2012 and this case would have likely been closed. We will trudge on.

For the foregoing reasons, the German States' Objection to the Class Claim is OVERRULED.  A separate order shall be entered accordingly.

Dated this 13th day of March, 2013
at Grand Rapids, Michigan

Honorable James D. Gregg
Chief United States Bankruptcy Judge